William D. BURTON, Defendant
Below, Appellant,

v.

STATE of Delaware, Plaintiff
Below, Appellee.

Supreme Court of Delaware.

Submitted Aug. 14, 1979.

Decided Feb. 9, 1981.

Eugene J. Maurer, Jr., Asst. Public Defender, Wilmington, for defendant below, appellant.

Norman A. Barron, Deputy Atty. Gen., Wilmington, for plaintiff below, appellee.

Before HERRMANN, C. J., and DUFFY and McNEILLY, JJ.

HERRMANN, Chief Justice.

The defendant, William D. Burton, was found guilty of two counts of rape in the second degree, 11 *Del.C.* § 763,[1] and one count of kidnapping in the first degree, 11 *Del.C.* § 783A(4).[2] He received a mandatory sentence of life imprisonment for the kidnapping, to be served consecutively with two ten-year terms for the rape convictions. The main ground of this appeal is the contention that it is unjust and unlawful to convict and punish the defendant for both rape and kidnapping on the facts of this case.

## I.

Shortly before three o'clock in the afternoon, the defendant, age 20, and the victim met as they left school. The victim, age 15, agreed to accompany the defendant to a vacant building nearby to see where he "stashed" his marijuana, so that she could help sell it for him. The victim described the building as follows: it had two rooms, one which she referred to as the "front" room, and another which she called the "back" room, and an area in between, which she referred to as the "hall" or "middle" area; there was a front entrance, a back entry from an alley, and a curtained front window; the only furnishings were an abandoned refrigerator and some drawers located in the "middle" area. Although the sizes of the rooms were not specified in the record, it appears that there was not a great distance between the front wall and the back room, since the victim indicated that the light coming through the curtained front window provided enough light for her to see the defendant when in the back room.

The defendant and the victim went up the alley behind the building and entered from the rear door at approximately 3:00 p. m. The defendant showed the victim the drawers in the "middle" area, and opened them to show her where his "stash" would be located. They shared a marijuana cigarette and then, at about 3:15 p. m., the victim told the defendant that she had to leave.

According to the victim's testimony, which the jury obviously accepted:[3] As she started walking towards the rear door, the defendant grabbed and twisted her arm and told her that she was not leaving. He forced her to move to the "middle" area by placing his arm around her neck. He then put his hands around her neck, and threatened to choke her if she did not disrobe by the time he counted to ten. The victim complied, and they then returned to the back room. Because the floor was bare, the victim returned to the "middle" area to retrieve her sweater to provide something to lie upon. The victim testified that while she was getting her sweater, the defendant held her by her hair until they returned to the back room, where the first rape occurred. After the rape, the defendant led the victim back to the middle area, where

---

1. 11 *Del.C.* § 763 provides:

   "§ 763. Rape in the second degree; class B felony.

   "A male is guilty of rape in the second degree when he intentionally engages in sexual intercourse with a female without her consent.

   "Rape in the second degree is a class B felony."

2. 11 *Del.C.* § 783A provides:

   "§ 783A. Kidnapping in the first degree; class A felony.

   "*A person is guilty of kidnapping in the first degree when he unlawfully restrains another person with any of the following purposes:*

   "(1) To hold him for ransom or reward; or

   "(2) To use him as a shield or hostage; or

   "(3) To facilitate the commission of any felony or flight thereafter; or

   "(4) To inflict physical injury upon him, or *to violate or abuse him sexually*; or

   "(5) To terrorize him or a third person; and the actor does not voluntarily release the victim alive, unharmed, and in a safe place prior to trial.

   "*Kidnapping in the first degree* is a *class A felony.*"

   (Emphasis added)

   This offense carries a mandatory sentence of life imprisonment. 11 *Del.C.* § 4205.

3. The defense was consent. The facts obviously accepted by the jury on the basis of the victim's testimony, will be stated hereafter on that basis.

she dressed. After smoking more cigarettes, the defendant again forced the victim to disrobe, and led her into one of the two rooms[4] where the second rape occurred. The defendant left the building at approximately 3:45 p. m., and the victim departed immediately thereafter.

## II.

The main thrust of the defendant's appeal is that it is unjust and unlawful to convict and punish him for both rape and kidnapping on these facts. First, the defendant asks for reversal of the kidnapping conviction because the "restraint involved [in the kidnapping] was entirely incidental to the underlying rape." Alternatively, the defendant invokes the merger-of-sentences doctrine, *State v. Honie*, Del.Supr., 310 A.2d 872 (1973) and *Dobrolenski v. State*, Del. Supr., 328 A.2d 447 (1974), and asks that the rape sentences be merged into the kidnapping sentence to prevent consecutive sentencing and consequent "double punishment for substantially the same offense," in violation of his rights under the Double Jeopardy Clauses of the State and Federal Constitutions.

## III.

We find unacceptable the contention that the kidnapping conviction must be set aside because the restraint involved in the kidnapping was merely or entirely "incidental" to the rape.

### A.

The defendant was convicted under 11 *Del.C.* § 783A(4), in that he "unlawfully restrain[ed]" the victim . . . "[t]o violate or abuse [her] sexually." The key word in the Kidnapping Statute for present purposes, the word "restrain," is defined specifically in the kidnapping context by 11 *Del.C.* § 786(a) as follows:

> " '*Restrain*' *means to* restrict another person's movements intentionally in such a manner as to *interfere substantially with* his *liberty* by moving him from 1 place to another, or by confining him either in the place where the restriction commences or in a place to which he has been moved, without consent. A person is moved or confined 'without consent' when the movement or confinement is accomplished *by physical force*, intimidation or deception, *or by any means, including acquiescence of the victim, if* he is a child *less than 16 years old . . .*"

(Emphasis added)

Thus, under § 786(a), the term "restrain," as used in the Kidnapping Statute, has three elements: (1) substantial interference with another's liberty; (2) by movement or confinement; (3) without consent. Where such "restraint" is imposed for the purpose of sexual abuse or violation, there is a kidnapping in the first degree under § 783A(4).

Taking the specified elements of "restraint" in reverse order:

Since the victim in the instant case was 15 years old at the time of the offense, the third "without consent" factor is met by a showing that the movement or confinement was accomplished "by any means, including acquiescence of the victim."

There was ample evidence of the movement or confinement of the victim—the second element of a kidnapping restraint. The confinement began at approximately 3:15 p. m., when the defendant, in response to the victim's attempt to leave, grabbed and twisted her arm and told her that she was not leaving. It included the defend-

---

**4.** It is not clear in which room the second rape occurred. On direct examination the victim testified that they walked into the front room, where the defendant placed his raincoat upon the floor, and that they then had intercourse in the front room. However, during cross-examination, the victim stated that this second rape occurred in the "back." To further complicate the matter, she also stated on cross-examination that after undressing they remained in the "front" of the building. These contradictions were not resolved. In any case, the contradictions are not crucial since, in any event, there was movement from one area to another and confinement to the building which, as appears *infra*, is important under the Kidnapping Statute.

ant's arm and hands around the victim's neck, threats to choke her, and seizing and holding her by her arm. This confinement continued until the victim left the building at approximately 3:45 p. m. Regarding movement, as has been stated, the defendant forced the victim to move from room to room several times during the course of the period of confinement.

And as to the first element of the statutory definition of "restraint" under the Kidnapping Statute, there was in the instant case, manifestly, "substantial interference" with the victim's liberty. Again, the arm-grabbing and twisting, the throat violence and threats of choking, and the seizing and holding by the hair constituted the requisite "substantial interference" with liberty.

### B.

But the defendant contends that all of this interference with the victim's liberty was "ordinarily incidental" to the rape and, as such, may not support a kidnapping conviction. He relies on the following Commentary to § 783 in the Delaware Criminal Code of 1973:

> " . . . It should be noted, however, that a person is not guilty of kidnapping under subsection (4) every time he commits the crime of rape or assault. Both of those crimes inevitably involve some restraint of the person but *much more* is required here before the additional and aggravated offense of kidnapping is committed. The State must prove that the restraint interfered *substantially* with the victim's liberty. *Such a requirement means that there must be more interference than is ordinarily incident to the underlying offense.*" (Emphasis added).

Commentary, Del.Crim.Code (1973), 11 Del.C. § 783, p. 228. And the defendant puts the crux of his position thusly: "What must therefore be decided is whether this case presents the 'much more' which is required under the Statute."

It is manifest from the facts (i. e. the confinement to the building for some 30 minutes and the several physical seizures of the victim), that there was present in the instant case a restraint which amounted to "much more" interference with the victim's liberty than is ordinarily incidental to the underlying offense of rape—a restraint amounting to that "substantial" interference with the victim's liberty expressly proscribed by the Kidnapping Statute.

### C.

The defendant contends that our Kidnapping Statute is so broad as to become a prosecutorial weapon that may be used indiscriminately and unjustly to supplement an underlying offense, such as rape or robbery, so as to elevate it to a mandatory life-sentence charge at the whim of the prosecutor. This is, and has been, a very troublesome question; we examine it in some depth:

The problem that this case presents—whether the kidnapping charge can be separated from the underlying offense—has been dealt with in many jurisdictions. See *Annot.,* "Seizure or Detention for Purpose of Committing Rape, Robbery or Similar Offense as Constituting Separate Crime of Kidnapping," 43 A.L.R.3d 699 (1972).

This problem has been resolved in two general ways. Under one view, it is the fact, not the distance, of asportation that constitutes kidnapping. See e. g., *State v. Williams,* 111 Ariz. 222, 526 P.2d 1244 (1974). In contrast, other jurisdictions maintain that seizure or detention alone is not necessarily sufficient to constitute the separate crime of kidnapping.

The initial leading articulations of the former view appeared in *People v. Chessman,* 38 Cal.2d 166, 238 P.2d 1001 (1951), and *People v. Florio,* N.Y.Ct.App., 301 N.Y. 46, 92 N.E.2d 881, 17 A.L.R.2d 993 (1950). However both California and New York have since led the movement away from this perspective in *People v. Levy,* N.Y.Ct. App., 15 N.Y.2d 159, 256 N.Y.S.2d 793, 204 N.E.2d 842 (1965), cert. denied, 381 U.S. 938, 85 S.Ct. 1770, 14 L.Ed.2d 701 (1965) and *People v. Daniels,* 71 Cal.2d 1119, 80 Cal. Rptr. 897, 459 P.2d 225, 43 A.L.R.3d 677 (1969).

In *Levy*, the N.Y. Court of Appeals overruled *Florio* "to limit the application of the kidnapping statute to 'kidnapping' in the conventional sense" (e. g. kidnapping for ransom), 204 N.E.2d at 844. *Levy* was a kidnap-robbery case, but New York applied the same limit to kidnap-rape in *People v. Lombardi*, N.Y.Ct.App., 20 N.Y.2d 266, 282 N.Y.S.2d 519, 229 N.E.2d 206 (1967). However, even before the adoption of our present Kidnapping Statute, this Court rejected the *Levy* position that convictions for kidnapping should be limited to those abductions made for the classic purpose of obtaining ransom. *Samuels v. State*, Del. Supr., 253 A.2d 201, 203 (1969). We adhere to the rejection of that limitation, especially in the light of our present Kidnapping Statute.

In *Daniels*, the Supreme Court of California affirmed the defendant's rape conviction, but reversed his kidnapping conviction, holding that "the intent of the Legislature . . . was to exclude from" the reach of the kidnapping statute those crimes in which "the movements of the victim are merely incidental to the commission of the" underlying crime "and do not substantially increase the risk of harm over and above that necessarily present in the [underlying crime] itself." 459 P.2d at 238. The *Daniels* Court ruled that such construction of the California Kidnapping Statute would avoid serious injustice and distortion in sentences, where, as in *Daniels* and as in the instant case, the kidnapping charges were based on room-to-room movements that occurred during the commission of the underlying crime of rape. The *Daniels* Court imposed a two-pronged test: In order to allow a conviction for kidnapping in conjunction with an underlying crime such as rape, robbery or assault: (1) the movement must be more than merely incidental to the underlying crime, and (2) the movement must substantially increase the victim's risk of harm above the risk inherent in the underlying crime.[5]

As the analysis of our Kidnapping Statutes demonstrates, the requirement that the defendant "interfere substantially" with the victim's liberty insures that where the movement or restraint is entirely incidental to the underlying crime, there cannot be a kidnapping conviction under 11 Del.C. § 783A(4). Thus, it is our opinion that our Statute is structured in a way that produces a requirement similar to the first prong of the California test for a kidnapping conviction.

The second prong of the *Daniels* test (the movement must substantially increase the victim's risk of harm above the risk inherent in the underlying crime) offers an appealing restriction upon the scope of the Kidnapping Statute, so that the extremely heavy penalty that it carries (life imprisonment) would have a closer relationship to the basic nature of the crime as we have known it in the past. Nevertheless, unlike the *Daniels* Court, we are unable to employ the device of statutory interpretation to this end for two reasons: First, we have no basis for concluding that our Legislature intended such a result. Furthermore, and more fundamentally, our Kidnapping Statute is clear and unambiguous on its face, leaving no room for such statutory interpretation and construction as the *Daniels* Court was free to exercise. Although our Kidnapping Statute may be complex and sometimes unduly harsh in result,[6] it is not am-

---

5. This second prong does not look to an increase in the likelihood that the underlying crime would occur, but instead refers to an "increase in the risk that the victim may suffer significant physical injuries over and above those to which a victim of the underlying crime is normally exposed." *People v. Timmons*, 4 Cal.3d 411, 93 Cal.Rptr. 736, 482 P.2d 648, 650 (1971).

6. For example, in the instant case, the maximum penalty for rape in the second degree is imprisonment for thirty years, whereas the kidnapping conviction carried a mandatory sentence of life imprisonment. In imposing sentence in the instant case, the sentencing Judge stated:

"* * * [T]his was, basically, one transaction, and the kidnapping on this case, although it meant [sic] all the technical requirements of the law, was to a great extent technically satisfied and did not loom in my opinion, as a separate independent offense, given the peculiar facts of this case.

biguous. Therefore, we may not invade the province of the Legislature by statutory construction amounting to judicial legislation, no matter how appealing a *Daniels* construction might be to avoid such result.

This same conclusion also applies to the defendant's request that we adopt the interpretation of the Kansas Kidnapping Statute in *State v. Buggs*, 219 Kan. 203, 547 P.2d 720, 731 (1976):

" * * * [I]f a taking or confinement is alleged to have been done to facilitate the commission of another crime, to be kidnapping the resulting movement or confinement:

(a) Must not be slight, inconsequential and merely incidental to the other crime;

(b) Must not be of the kind inherent in the nature of the other crime; and

(c) Must have some significance independent of the other crime in that it makes the other crime substantially easier of commission or substantially lessens the risk of detection.

"For example: A standstill robbery on the street is not a kidnapping; the forced removal of the victim to a dark alley for robbery is. The removal of a rape victim from room to room within a dwelling solely for the convenience and comfort of the rapist is not a kidnapping; the removal *from a public place to a place of seclusion is.*"

Again, as appealing as such construction may be to prevent potential abuse and unduly harsh results, our Kidnapping Statute is unambiguous and, therefore, we are not free to depart from its clear and explicit language by statutory construction. This troublesome problem demands the attention of the General Assembly.

Thus, all that remains to show "restraint" within the Kidnapping Statute is the first element—that the defendant "substantial-

ly" interfered with the victim's liberty. The Delaware Criminal Code Commentary, upon which the defendant relies, notes that "a person is not guilty of kidnapping under subsection (4) every time he commits the crime of rape." The Commentary observes that although some restraint is involved in every rape, the use of the word "substantially" in § 783 "means that there must be more interference than is ordinarily incident to the underlying offense." Commentary, Del.Crim.Code (1973), 11 *Del.C.* § 783, p. 228.

As we have hereinabove held, the record in the instant case manifestly supports a finding of "substantial" interference with the victim's liberty. Clearly, on the record before us, there was more interference with the victim's liberty than is "ordinarily incident" to the offense of rape. Thus, all of the elements needed to show "restraint" under § 786(a) are to be found in this record, and the conviction of kidnapping under § 783A(4) is warranted thereunder.

## IV.

■ The defendant also contends that punishment for both the kidnapping and rape offenses resulted in double punishment for substantially the same offense and, therefore, requires that the rape sentences be merged into the kidnapping sentence under the doctrine of merger of sentences announced in *State v. Honie*, Del.Supr., 310 A.2d 872 (1973), and *Dobrolenski v. State*, Del.Supr., 328 A.2d 447 (1974). The defendant refers to the doctrine announced therein that a trial judge has the discretion to merge sentences to prevent double punishment for "substantially the same offense" *State v. Honie, supra* at 874. However, that doctrine may not be invoked here because, subsequent to those decisions, 11 *Del.C.* § 3901(d)[7] was enacted in 1977 "pur-

* * * * * *

"As far as the sentencing is concerned I am persuaded that the law requires me to impose consecutive sentences. There's some question about this, and if, under the doctrine of State against *Hony* [sic]—counsel are familiar with this—if there were a merger and I

had the option, I would merge these sentences."

7.  11 *Del.C.* § 3901(d) provides: "No sentence of confinement of any criminal defendant by any court of this State shall be made to run concurrently with any other sentence of confinement imposed on such criminal defendant." The

port[ing] to eliminate concurrent sentencing entirely." *Davis v. State*, Del.Supr., 400 A.2d 292, 295 (1979). This case is governed by § 3901(d) and that Statute is the complete answer to the defendant's merger contention.

## V.

The defendant argues that the application of § 3901(d) to these convictions for both rape and kidnapping violates his constitutional guarantee against double punishment for the "same offense." U.S.Const., amend. V; Del.Const., art. I, § 8.

■ This Court follows the *Blockburger*[8] test for determining whether two offenses are sufficiently distinguishable to permit the imposition of cumulative punishment:

> "[t]he applicable rule is that where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not."

*Hunter v. State*, Del.Supr., 420 A.2d 119, 125, 130–1 (1980).

■ Viewing the Kidnapping Statute [§ 783A(4)] with the Rape Statute [§ 763] in the light of the statutory definition of the key word "restrain" [§ 786(a)] and the Delaware Criminal Code Commentary to § 783,[9] it is clear that the *Blockburger* test is met and that the two offenses are not the "same" within the double jeopardy context. Manifestly, a kidnapping conviction under our Statute requires proof of a fact which a rape conviction does not: proof of substantial interference with the victim's liberty beyond the interference or restraint that is normally incident to a rape; and a rape requires the penetration of a female by a male, which a kidnapping does not.

It is held that, under the facts of this case, the defendant was not cumulatively

sentenced for the same offense in violation of his double jeopardy guaranty.

## VI.

■ The defendant contends that reversal is necessary because the jury's verdict of first degree kidnapping is fatally inconsistent with its verdict of second degree rape, for the reason that implicit in the latter verdict is the finding that the victim was the defendant's voluntary social companion. The defendant argues that it is implicit because the jury rejected a finding of first degree rape, which has as one of its alternative elements that "[t]he victim was not the defendant's voluntary social companion on the occasion of the crime and had not previously permitted him sexual contact." 11 *Del.C.* § 764(2). Because second degree rape does not have this element, the defendant concludes that the jury decided that the victim was Burton's voluntary social companion.

Assuming, without deciding, that such a finding is implicit in the second degree rape verdict, it is not fatally inconsistent: it is possible subsequently to kidnap a person who may have been one's voluntary social companion initially. As the "jury's findings are capable of logical reconciliation," *Kreisher v. State*, Del.Supr., 319 A.2d 31, 33 (1974), there is no fatal inconsistency requiring reversal of defendant's convictions by this Court.

## VII.

■ On direct examination, the defendant testified that a police detective struck him in the eye during interrogation, causing a welt. The State sought to rebut this by introducing a police photograph of the defendant taken six years earlier; since the defendant had a welt under his eye in the photograph, it was sought to demonstrate to the jury that the defendant was lying

---

original version of this Statute (60 Del.Laws, ch. 308) stated that "[a]t present persons con- *victed* of two or more offenses all too often receive concurrent sentencing. This bill would prohibit concurrent sentencing in such situations."

**8.** *Blockburger v. United States*, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932).

**9.** All quoted hereinabove.

about being struck by the detective. After having the photograph marked for identification, the prosecutor showed a police detective the photograph and asked if he could identify it. The detective stated: "It is a police photograph." The defendant moved for a mistrial, on the ground that the reference suggested that the defendant had a prior criminal record dating back to his juvenile days. The Trial Judge (out of the hearing of the jury) denied the defendant's mistrial motion, and ordered that the police numbers be deleted from the photograph prior to its introduction into evidence. When the jury returned, the Judge carefully instructed them to:

> "ignore any references to where this photo came from. The only relevant fact of this photograph is when it was taken, not why it was taken, or where it was taken. Any reference by this witness as to where it came from or why it was taken is totally irrelevant, and has no bearing on any issue in this case and should be ignored by you. This photo was admitted for one purpose and one purpose only, and that is its possible relevance because of its date. That is all that [it] is admitted for."

The photograph was then admitted into evidence, over defendant's objection, to allow the jury to decide if the defendant lied about being struck by the detective during interrogation.

Under the three-part test for admission of "mug shots" adopted in *Brookins v. State*, Del.Supr., 354 A.2d 422, 423 (1976),[10] the admission of this photograph was not reversible error. First, there was a "demonstrable need" to rebut the defendant's assertion that the detective had struck him during the interrogation; it was important to the State that the jury have a basis of assessing the defendant's credibility since the sole defense of consent rested entirely on his credibility. Secondly, the police numbers were excised, so that when the

photograph was shown to the jury, it would not suggest that defendant had a prior criminal record. Finally, as to the introduction drawing "particular attention to the source or implications of the photographs," the unfortunate reference to the defendant's picture as a "police photograph" was cured by the Trial Judge's careful instruction to the jury to "ignore any references to where this photo came from."

Accordingly, it is held that there was no fatal error in the introduction of the photograph into evidence.

## VIII.

■ Finally, the defendant contends on this appeal that an oral statement made by him in response to police interrogation was taken after he requested an attorney, in violation of his Sixth and Fourteenth Amendment right to counsel.

The statement consisted of a denial that the defendant had been with the victim and that any rape by him had taken place. This statement was admitted in evidence over the objection of counsel. It is now urged that since the defendant relied at trial on the defense of consent, the statement was fatally damaging to his credibility.

After oral argument on this appeal, this Court remanded the cause to the Trial Court for further findings upon this ground of the appeal, under an Order containing the following:

> "(2) That in ruling upon the admissibility of the defendant's statement the Trial Court stated the following only:
>
> 'I am satisfied that a proper *Miranda* warning was given prior to that statement being made, and I am further satisfied that the statement was made under conditions which were not strictly accusatorial, but primarily spontaneous. I am satisfied that they were made voluntarily.

10. "(1) The prosecution must show a demonstrable need to introduce the photographs; (2) the photographs, if shown to the jury, must not imply that defendant has a prior criminal record; and (3) the introduction at trial does not

draw particular attention to the source or implications of the photographs." This test was taken from *United States v. Harrington*, 2d Cir., 490 F.2d 487 (1973).

'They are equivocal. They may be considered as incriminating, but could also be merely equivocal statements. They are relevant.

'I am satisfied there was no duress used prior to those statements being made. I am satisfied that they were made prior to any altercation between the defendant and certain police officers and, therefore, they are unaffected by whatever took place between the defendant and the officers.

'Accordingly, the motion to suppress those statements is overruled.' (T. 171–172).

"(3) That in order to give due consideration to the above mentioned ground of the defendant's appeal, this Court needs findings by the Trial Court upon the following issues:

"(a) Did the defendant indicate 'in any manner at any stage of the proceedings' that he wished to consult an attorney before speaking? See *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 1612 [16 L.Ed.2d 694] (1966).

"(b) Did the defendant either (1) expressly or (2) impliedly waive his right to counsel voluntarily, 'knowingly and intelligently'? See *Miranda v. Arizona*, 86 S.Ct. at 1628; *State v. Butler* [295 N.C. 250] 244 S.E.2d 410 (1978), (heard by the U.S. Supreme Court, 3/27/79, see 25 Crim.L.Rep. 4009).

"(c) Is the admissibility of the defendant's statement governed by *Harris v. New York*, 401 U.S. 222, 91 S.Ct. 643 [28 L.Ed.2d 1] (1971) and *Oregon v. Hass*, 420 U.S. 714, 95 S.Ct. 1215 [43 L.Ed.2d 570] (1975).

"NOW, THEREFORE, IT IS ORDERED:

"(1) That this cause be and it is hereby remanded to the Superior Court with directions to make findings upon the issues set forth in Paragraph 3 above, and to file the same herein at the earliest practicable time; * * *."

The Trial Court filed the following findings and conclusions in compliance with the foregoing remand:

"The Court has secured a transcript of that portion of the trial record which bears upon the defendant's statement and, after deliberation, makes the following findings of fact and conclusions of law:

"*Findings of Fact*:

"(1) The defendant, who was then 20 years of age, came to the Wilmington Police Station in the company of his mother at approximately 9:30 on the morning of his arrest, upon being apprised that the police were looking for him.

"(2) Defendant, in the presence of his mother, was advised by the police of the charges pending against him. Defendant then conversed with his mother within the hearing of the officers, and denied his involvement. His mother, thereupon, told him she would get him a lawyer. Defendant responded: 'Get the best. Get Mr. Wise.' The mother then left the investigation room.

"(3) After his mother's departure defendant was given a complete *Miranda* warning including his right to counsel. He advised the officers that he would talk to them but would not sign a written statement. His statements at that time were generally exculpatory and he denied knowledge of the incident. The two interviewing officers alternatively left the room for various periods of time. At no time did the defendant indicate any unwillingness to talk or that he desired the presence of an attorney.

"(4) Approximately one hour after the interview began, while the defendant was being booked, he volunteered a remark that, 'Man, its not possible to rape anybody if they don't want to be raped.' Detective Scully, one of the interrogating officers, continued the conversation and in the resulting dialogue, the defendant made the alleged inculpatory statement: 'Did the girl say that I did' in response to the question: 'Did you have a gun or a knife.'

"(5) While defendant claims that he was not given his *Miranda* warning separately in advance but, rather, inter-

spersed in the questioning, I determine otherwise as a matter of credibility. He clearly was aware of his right to counsel during questioning but at no point did he refuse to answer questions or ask that counsel be present.

"(6) The inculpatory comments were both voluntary and spontaneous and took place after a considerable discussion with the officers during which the defendant indicated a willingness to talk without the presence of a lawyer.

"*Conclusions of Law*:

"(1) Defendant was effectively advised of his full range of rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602 [16 L.Ed.2d 694] (1966) before questioning by the officers to whom he had voluntarily responded. The idea of securing counsel originated with his mother, not the defendant, although he responded to her offer by suggesting a name. His suggestion cannot be considered a refusal to participate further in the questioning which followed since it is unclear whether his mother intended to secure counsel immediately for him or arrange for such service at a future date. The officers were, therefore, entitled to pursue the questioning if the defendant were so inclined. By his voluntary answering of further questions and his willingness to provide information, the defendant displayed an implicit waiver of his right to decline further participation without the presence of counsel. Given the particular facts of this case, including the defendant's voluntary appearance at the police station, his previous experience with *Miranda* warnings as a juvenile and the spontaneous nature of his comments, I conclude that there was a knowing and effective implicit waiver of his right to counsel. *State v. Butler* [441 U.S. 369, 99 S.Ct. 1755, 60 L.Ed.2d 286] decided by the U.S. Supreme Court, April 24, 1979.[11]

"(2) Since the question of the admissibility of defendant's statement arose as part of the State's evidence and not in the context of impeachment, it is unnec-

essary to consider whether such statements would be admissible for the purpose of cross-examination under *Harris v. New York*, 401 U.S. 222, 91 S.Ct. 643 [28 L.Ed.2d 1] (1971) or *Oregon v. Hass*, 420 U.S. 714, 95 S.Ct. 1215 [43 L.Ed.2d 570] (1975). It is noted, however, that the disputed statement was determined at trial to have been voluntarily made. *Jackson v. Denno*, 378 U.S. 368 [84 S.Ct. 1774, 12 L.Ed.2d 908] (1964)."

\* \* \* \* \* \*

In the light of *Butler*, we find sufficient evidence in the record to support the Trial Court's findings of fact and we find no fatal error in its conclusions of law regarding the admissibility of the defendant's statement in question.

\* \* \* \* \* \*

Affirmed.

11. *State of North Carolina v. Butler*, 441 U.S. 369, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979).