Lemuel SCOTT, Defendant-Appellant,

v.

STATE of Delaware, Plaintiff-Appellee.

Supreme Court of Delaware.

Submitted: June 10, 1986.
Decided: Feb. 24, 1987.

Rehearing Denied March 17, 1987.

Nancy Jane Mullen (argued), Asst. Public Defender, Wilmington, for defendant-appellant.

Richard E. Fairbanks, Jr., Chief of Appeals Div. (argued), Timothy J. Donovan, Jr., Loren C. Meyers, M. Jane Brady, Deputy Attys. Gen., Dept. of Justice, Wilmington, for plaintiff-appellee.

Before HORSEY, MOORE and WALSH, JJ.

HORSEY, Justice:

Defendant, Lemuel Scott, seeks reversal of his convictions in a jury trial of Rape in the First Degree (11 *Del.C.* § 764) and Kidnapping in the First Degree (11 *Del.C.* § 783A). Defendant was sentenced to consecutive life terms for each offense, with the rape conviction requiring twenty years minimum mandatory sentence. On appeal, defendant asserts seven grounds for reversal. The issues raised involve essentially four subjects: (1) right to a speedy trial; (2) evidentiary matters; (3) jury instructions; and (4) sufficiency of the evidence to support the defendant's convictions. Having considered all the issues, we conclude that defendant's conviction for rape should be affirmed. However, because the Trial Court committed plain error in its jury instruction on kidnapping, 11 *Del.C.* § 786(a), we reverse defendant's conviction for kidnapping and remand the case for a new trial upon the kidnapping charge.

\* \* \* \* \* \*

The facts relevant to the underlying offenses are: that in the early morning hours of February 25, 1984, victim was returning home by car from an evening church service in Baltimore, Maryland. After dropping off another church member in her hometown of Harrington, Delaware, at approximately 3:00 a.m., she came upon a car stopped in the roadway in front of her. The driver, defendant Lemuel Scott, was standing by the side of the car, indicating she should go around him. As she did so, he motioned her to stop and she complied. [She later said she did so because she saw a "Jesus" sticker on his car's bumper; and she thought he might be, like her, a "born-again Christian."] Defendant asked her if she had any jumper cables, stating that his car was broken down. When she stated that she did not have any cables, he asked her if she would take him to get a set of cables from his home, about six miles away. She reluctantly agreed to do so, even though she wanted to go home.

Following defendant's instructions, she drove defendant out of town into a rural area to what defendant said was his residence, a darkened house trailer with an outdoor light burning. Defendant got out of victim's car, walked around behind the house trailer and was gone for about five minutes. When he returned without any cables, he stated that they must be at a relative's and asked to be taken there. Victim said that that was the last place she would take him because she wanted to go home.

Following defendant's directions, defendant led victim to a run-down farmhouse up a lane. The house appeared to be deserted or abandoned. Defendant again got out of the car—purportedly to look for jumper cables—but returned to the car in less than a minute without any jumper cables and without mentioning them again. Victim then told defendant she was going to leave and started to drive out to the highway. Defendant then said, "Wait a minute, I've got to think"; seized the car's automatic transmission shift handle, and pushed it into "park."

Defendant then said that it had been a long time since he had been with a woman and he talked about how many times he had been hurt. He started beating his fists on the dashboard and grabbed victim's wrist. Victim became frightened. Defendant then took the keys from the ignition and told victim that he would not return the keys unless she got into the back seat and had sex with him.

Victim stated that she tried to reason with defendant and told him that she did not want to. Defendant remained insistent, stepped up his previous demands, and threatened to hurt victim unless she complied. When victim continued to refuse, defendant resumed pounding his fists on the dashboard, again grabbed her wrists, and ordered her into the back seat of the car. She eventually complied, climbed into the back seat of the car, but refused to undress beyond taking off her hose. Defendant handed back her car keys and proceeded to have sexual intercourse. Victim immediately returned to the front seat, started the car, and drove back towards Harrington and to defendant's car.

Defendant asked victim not to report what had happened, stated that he would like to see her again, and asked for her telephone number. Victim gave defendant a false number and told him she would not report him. Defendant returned to his car, started the engine without difficulty, and drove off. Defendant's story of his car's being disabled was apparently a hoax, as he admitted at trial and the police confirmed. The victim drove immediately to her pastor's home to report what had occurred. It was then nearly 5:00 a.m. Her pastor urged victim to call the police and she did. Victim was later taken to a nearby hospital for a medical examination. Emotionally upset and crying, she stated that she had been raped and complained of her wrists hurting her.

Two days later, on February 27, the victim identified defendant in a photo array as the man she had stopped to help and the man who had raped her. (She also identified the defendant at trial.) Scientific examination of the car and later FBI labo-

ratory analysis established that defendant and the victim had engaged in sexual intercourse in the rear seat of the car. Several of the hairs found in the back seat matched the characteristics of the defendant's head hair and one hair matched the characteristics of his pubic hairs. Similarly, a stain found on the back seat was consistent with a mixture of semen from Scott and vaginal fluid from the victim.

Defendant was arrested on February 28, 1984, on charges of rape in the second degree and kidnapping in the second degree. Incarcerated in default of bail, defendant waived a preliminary hearing on March 8. Following subsequent police investigation, defendant was indicted on April 2, 1984, on enhanced charges of rape in the first degree and kidnapping in the first degree. Arraigned on April 13 in Superior Court, defendant pled not guilty and requested a jury trial.

The following facts become relevant to the speedy trial issue. Trial was initially set for May 14, 1984; but trial was continued at the State's request for need of more preparation. Trial was rescheduled for July 9, but again postponed at the State's request, due to the unavailability of one or both FBI agents who were expected to give expert testimony for the State. A third trial date of July 31 was set, but once again at the State's request, the trial was postponed. The prosecutor was then involved in an ongoing trial that had started earlier. Defendant's trial was then rescheduled for a fourth time for September 24, 1984.

On August 29, defendant filed a *pro se* motion to dismiss the charges against him for pretrial delay. Superior Court denied the motion without evidentiary hearing on September 11, but rescheduled trial for September 24. On September 24, trial was again postponed, for lack of a trial judge, and trial finally commenced on October 22. On the morning the trial began, defendant renewed his motion to dismiss based on delay. Defendant conceded that the delay had not adversely affected the availability of witnesses but asserted that the delay had affected his nerves and his mental outlook. The Court thereupon denied de-

fendant's motion. Following a two-day jury trial, defendant was convicted of rape in the first degree and kidnapping in the first degree.

## I

We first address defendant's contention that he was denied his right to a speedy trial under the Sixth Amendment to the United States Constitution and Article I, section 7 of the Delaware Constitution.[1] Defendant contends that the seven-month, three-week period between his arrest on February 28, 1984 and his trial on October 22, 1984 violated his right to a speedy trial. We hold that the Trial Court did not commit legal error or abuse its discretion in denying the defendant's motion to dismiss for violation of his right, under either the Federal or Delaware Constitutions, to a speedy trial.[2]

 In determining whether a defendant's right to a speedy trial has been violated, this Court has adopted the balancing test established in *Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972). *See Beebe v. State*, Del.Supr., 346 A.2d 169 (1975). In *Barker*, the United States Supreme Court identified four factors to be considered in assessing whether a defendant's right to a speedy trial has been violated. *Id.*, 407 U.S. at 530, 92 S.Ct. at 2192. They are: the length of delay, the reason for delay, the defendant's assertion of his right, and prejudice to the defendant. *Id.* As to the first factor, the Court stated, "[t]he length of the delay is to some extent a triggering mechanism. Until there is some delay which is presump-

tively prejudicial, there is no necessity for inquiry into the other factors that go into the balance." *Id.*

 Under the facts of this case, outlined above,[3] we find that the purported length of the trial delay, seven months and three weeks, was not sufficient to trigger an inquiry into the remaining three *Barker* factors. Indeed, we find no persuasive basis for including the forty-three day period from arrest to arraignment on the enhanced charges within the relevant time frame. The record supports the conclusion that this time was reasonably spent by the State in the investigative phase of the case. Thus, we narrow our focus to the remaining six months between arraignment and trial; and we conclude that such a delay is not presumptively prejudicial. *See Tramill v. State*, Del.Supr., 425 A.2d 142, 143 (1980) (thirteen months not presumptively prejudicial); *Beebe, supra* (twelve months not presumptively prejudicial). *Cf. Fensterer, supra* (twenty-six month delay presumptively prejudicial).

 However, were we to accept the greater time frame as the measuring period and assume the time delay to meet the threshold showing of being "presumptively prejudicial," an analysis of the other *Barker* factors shows that the delay was not such as to deprive defendant of his right to a speedy trial. As to the reason for delay, the second factor, the first trial continuance from May 14 to July 9 seems entirely appropriate—to await the results of FBI analysis tests for hair comparison and semen analysis. Since such evidence was potentially exculpatory, it was clearly in

---

1. The United States and Delaware Constitutions provide in relevant part:
 "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial...."
 U.S. Const. amend VI. Article I, section 7 of the Delaware Constitution, using similar language, states:
 "In all criminal prosecutions, the accused hath a right ... to have ... a speedy and public trial...."

2. "A defendant has no greater right to a speedy trial under Article I, section 7 of the Delaware Constitution than he has under the Sixth

Amendment to the United States Constitution." *Fensterer v. State*, Del.Supr., 493 A.2d 959, 964 (1985), *rev'd on other grounds*, —— U.S. ——, 106 S.Ct. 292, 88 L.Ed.2d 15 (1986). Thus, our analysis of Scott's state constitutional challenge parallels that of his federal claim. *Id.* at 964–65. *See also Shockley v. State*, Del.Supr., 269 A.2d 778 (1970).

3. As the *Barker* Court pointed out, "[B]ecause of the imprecision of the right to speedy trial, the length of delay that will provoke such inquiry is necessarily dependent upon the peculiar circumstances of the case." 407 U.S. at 530–31, 92 S.Ct. at 2192.

the best interest of both parties to postpone the trial, as defendant's lack of objection would suggest.

The second trial continuance, though also at the State's request, was for a bona fide reason—the unavailability of FBI agents to testify as expert witnesses. Again, defendant registered no objection and the trial was rescheduled for July 31. The trial was again postponed, for a third time, because the State's prosecutor in charge of the case had by then begun another trial. Again, no claim of prejudicial delay was raised by defendant; and the case was rescheduled for trial on September 24.

The fourth trial postponement—for lack of a judge—is clearly not attributable to the prosecution. Hence, although three of the trial delays (between May 14 and July 31) were the ultimate responsibility of the State, the continuances were granted for "more neutral reasons" which may not be weighed heavily against the State. *Barker*, 407 U.S. at 531, 92 S.Ct. at 2192. Furthermore, there is no evidence that the State was acting in bad faith or trying to manipulate the system—a reason that would weigh heavily against the State. *Id.*

The third *Barker* factor—the defendant's assertion of his right—weighs heavily against defendant. The defendant did not arguably invoke his right to a speedy trial until he moved for a reduction in bail on July 31. Thereafter, on August 29, defendant filed a *pro se* motion for dismissal on the basis of pretrial delay. Therefore, defendant's first complaint of record only followed the fourth postponement and the fifth month of what was ultimately a seven-month, three-week delay.

Similarly, the fourth factor—prejudice to the defendant—weighs against Scott. The defendant has failed to show that he sustained prejudice which hindered his right to a fair trial or his ability to prepare his case. Thus, even on applying the *Barker* balancing test, we find the delay in this case

not to reach constitutional dimensions. This conclusion applies to both the defendant's rights under the Delaware Constitution as well as his rights under the United States Constitution. *See supra*, note 1.

## II

■ Defendant's second contention is that two prosecution witnesses' references on direct examination to a "mug shot" of the defendant (that was included in an out-of-court photo array shown to victim) constitutes reversible error, even though not objected to by counsel at trial. We do not find the unsolicited, though inappropriate, characterization of the photograph of defendant as a "mug shot" so prejudicial as to deprive defendant of a fair trial. Had defendant made a timely objection, we are certain that the Trial Judge would have taken appropriate corrective action; and in the absence of objection, we decline to apply the plain error rule. *Young v. State*, Del.Supr., 431 A.2d 1252, 1255 (1981); *see* Supreme Court Rule 8 and D.R.E. 103(a).[4]

During the State's case-in-chief, Carl McIlroy, Chief of the Harrington Police Department, testified as follows:

PROSECUTOR: I show you State's [exhibits] for Identification S and T and ask you if you recognize those two items? McELROY: S is a mug shot of Mr. Lemuel Scott which was taken on October 26, 1979, by the Harrington Police Department. It is our ID photo. T is a mug shot of John Leonard Flamer which was taken on 5/27, 1975, which is also a Harrington Police Department ID photo.

Subsequently, State Police Detective Joseph Condron took the witness stand and on redirect examination was questioned as follows:

PROSECUTOR: Detective Condron, when Chief McIlroy was testifying regarding the photos he gave you, I believe he referred to them both as Harrington identification photographs and mug

---

4. D.R.E. 103(a) states in pertinent part:

 (a) **Effect Of Erroneous Ruling.** Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and

 **(1) Objection.** In case the ruling is one admitting evidence, a timely objection or motion strike appears of record, stating the specific ground of objection, if the specific ground was not apparent from the context; or....

shots. Would you explain, please, are these in fact identification photographs?

CONDRON: They are, yes.

PROSECUTOR: The format that is used: the front view, side view, is that the kind that people universally seem to call a mug shot format in a photograph?

CONDRON: They are commonly referred to as mug shots, yes.

PROSECUTOR: Are they taken for any number of purposes by the various departments?

CONDRON: That's correct.

Prosecutorial use of the term "mug shot" has been criticized, if not condemned, by our courts for many years, for obvious reasons. "The only reasonable inference which [can] be drawn from [such testimony is] that the defendant had previously been in trouble with law enforcement authorities"; and such testimony is, thus, "incompetent and prejudicial." *State v. Boyd*, Del.Super., 91 A.2d 471 (1952); *Brookins v. State*, Del.Supr., 354 A.2d 422, 423 (1976); *Johnson v. State*, Del.Supr., 247 A.2d 211, 212–213 (1968). The State concedes that the police witness' choice of words was "unfortunate," but argues that we are not dealing with prosecutorial error. The State's redirect examination of Detective Condron was, the State submits, "an obvious attempt by the prosecutor to undo or to ameliorate whatever prejudice [defendant] might have suffered [from McElroy's use of the term]."

Moreover, any harm from the adverse inference that defendant had been "in trouble with law enforcement authorities" in the past was rendered harmless by the disclosure to the jury of defendant's prior criminal convictions through the cross-examination of his character witness. Thus, the jury learned nothing inferentially about the defendant through the inappropriate "mug shot" testimony that it would not

have learned later in the trial. *Spencer v. State*, Del.Supr., 307 A.2d 794, 796 (1973). Accordingly, defendant's claim of prejudicial error must be rejected.

### III

■ Defendant next asserts that the Trial Court's admission without objection of the State's cross-examination of defendant's character witness concerning his two prior criminal convictions also deprived defendant of a fair trial. Alternatively, defendant argues that the Trial Court should have *sua sponte* given a limiting instruction as to its relevancy. We find that the State's cross-examination and the Trial Court's failure to give a special instruction do not, singly or collectively, constitute plain error. *Wainwright v. State*, Del. Supr., 504 A.2d 1096 (1986); D.R.E. 103(a).

Defendant does not dispute that he put his character and reputation into evidence and thereby invited questions on cross-examination to test the knowledge of his character witness as to contradictory community opinion. *Steigler v. State*, Del. Supr., 277 A.2d 662 (1971); D.R.E. 405 (a).[5] Defendant, however, argues that the Trial Court did not follow the guidelines for the cross-examination of character witnesses that this Court set forth in *Woods v. State*, Del.Supr., 315 A.2d 589 (1973).

*Woods*, however, is distinguishable. In *Woods*, we held that the Trial Court erred in allowing the State's cross-examination of a defense character witness because there was no factual basis for the questions. *Id.* at 591. In this case, the specificity of the prosecutor's questions and the defendant's convictions on both an assault charge and for displaying a fictitious motor vehicle license plate established a factual basis for the State's questions used to impeach the character witness' testimony. Evidence of defendant's prior criminal acts thus became admissible under the exception of D.R.E.

---

5. D.R.E. 405(a) states:

(a) **Reputation.** In all cases in which evidence of character or a trait of character of a person is admissible, proof may be made by testimony as to reputation. On cross-examination, inquiry is allowable into relevant specific instances of conduct.

405(a). *Steigler, supra; Styler v. State,* Del.Supr., 417 A.2d 948 (1980); *DeJarnette v. State,* Del.Supr., 338 A.2d 117 (1975); *Spencer v. State, supra.* Clearly, the Trial Court did not commit plain error in failing to give a limiting instruction on the relevancy of defendant's convictions without a request for a limiting instruction by counsel. D.R.E. 105.[6]

## IV

We next address the legal sufficiency of the Trial Court's jury instructions on kidnapping in the first degree, 11 *Del.C.* § 783A(4), to which no exceptions were taken at trial. On appeal, defendant now contends that the jury charge was fundamentally erroneous in three respects, which we take up *seriatim.*

## A.

The first alleged error in the kidnapping charge is one of omission, that is, the failure of the Court to instruct the jury that the element of restraint within our kidnapping statute, 11 *Del.C.* § 783A, requires proof of more interference with a victim's liberty than is ordinarily incidental to the underlying offense of rape. *See Burton v. State,* Del.Supr., 426 A.2d 829 (1981). Our first degree kidnapping statute provides, in pertinent part:

**6.** D.R.E. 105 provides:
 **RULE 105. LIMITED ADMISSIBILITY.**
 When evidence which is admissible as to 1 party or for 1 purpose but not admissible as to another party or for another purpose is admitted, the court, upon request, shall restrict the evidence to its proper scope and instruct the jury accordingly.

**7.** Section 786(a) provides in relevant part:
 "Restrain" means to restrict another person's movements intentionally in such a manner as to interfere substantially with his liberty by moving him from 1 place to another, or by confining him in either place where the restriction commences or in a place to which he has been moved, without consent. A person is moved or confined "without consent" when the movements or confinement is accomplished by physical force, intimidation or deception, or by any

## § 783A. Kidnapping in the first degree; class A felony.

A person is guilty of kidnapping in the first degree when he unlawfully restrains another person with any of the following purposes:

\* \* \* \* \* \*

(4) To inflict physical injury upon him, or to violate or abuse him sexually; or

\* \* \* \* \* \*

and the actor does not voluntarily release the victim alive, unharmed and in a safe place prior to trial.

In *Burton,* we held that "the requirement [of section 786(a)][7] that the defendant 'interfere substantially' with the victim's liberty insures that where the movement or restraint is entirely incidental to the underlying crime, there cannot be a kidnapping conviction under 11 *Del.C.* § 783A(4)." *Id.* at 834.[8] We, however, did not require the Trial Court in *Burton* to explicitly so instruct the jury because the record clearly supported a finding of "substantial interference" with the victim's liberty. *Id.* at 835. However, under the facts of this case, the issue being less clear, such an instruction was necessary to assure the defendant a fair trial on both charges.

Here the victim conceded, at trial, that until she was forced to move from the

means, including acquiescence of the victim, if he is a child less than 16 years old or an incompetent person. . . .

**8.** The Commentary to section 783 in the Delaware Criminal Code of 1973 states:
 It should be noted, however that a person is not guilty of kidnapping under subsection (4) every time he commits the crime of rape or assault. Both of those crimes inevitably involve some restraint of the person, but much more is required here before the additional and aggravated offense of kidnapping is committed. The State must prove that the restraint interfered *substantially* with the victim's liberty. Such a requirement means that there must be more interference than is ordinarily incident to the underlying offense.
 Commentary, Del.Crim.Code § 783 at 228 (1973) (emphasis in original).

front to the back seat of the car, she had remained voluntarily with the defendant. She further testified that during that time they discussed a variety of subjects. The evidence strongly suggests that the victim was free to drive away until defendant put the car in "park" and demanded the keys. Additionally, had the victim felt restrained, she could have driven off and left defendant on either of two occasions that he left the car. Hence, it is disputable whether the victim was restrained until immediately before the defendant compelled her to submit to intercourse.

█ So viewed, the facts arguably do not support a finding of "substantial interference." Under the circumstances, the Trial Court was obliged to instruct the jury that a conviction of kidnapping would require proof of more interference than is ordinarily incident to the crime of rape. In our view, such an instruction was necessary to enable a jury intelligently to perform its duty when returning a verdict as to both rape and kidnapping. *Whalen v. State,* Del.Supr., 492 A.2d 552, 559 (1985). The failure to give such an instruction was reversible error.

### B.

█ Defendant next contends that the Trial Court misstated the statutory definition of "restrain" under section 786(a) by referring to irrelevant matters in its instruction. In its charge, the Trial Court defined the term "restrain" to the jury as follows:

> Restrained [sic] means to restrict another person's movements intentionally or in such a manner as to interfere substantially with his liberty by moving him from one place to another or confining him either in the place where the restriction commences or in a place where he has been moved without consent. A per-

son is confined without consent when the movement or confinement is accomplished by physical force, intimidation or deception *or by any other means including acquiescence of the victim. The victim may have been a small child or incompetent person.*

(underlining added for emphasis). Defendant argues, and the State concedes, that the Trial Court prejudiciously misstated the definition of "restrain" by referring to the underlined irrelevant portions of section 786(a). The given instruction would suggest that a victim's acquiescence can satisfy the restraint element of section 786(a) only if the victim is a child or an incompetent person. In the form given, a jury could find any victim to have been restrained sufficiently to establish kidnapping simply through acquiescence in a defendant's course of conduct.

Since there is no evidence that victim was either a small child or an incompetent person, the underlined portion of the jury instructions was factually irrelevant. Hence, the underlined portion of the instruction was totally inappropriate and tended, at the very least, to confuse the issues by over-definition. *State v. Gabriel,* Conn.Supr., 192 Conn. 405, 473 A.2d 300, 308 (1984). Therefore, we must find the Trial Court to have committed plain error in its misstatement of the definition of "restrain" and its inclusion of irrelevant matter.[9] Hence, defendant's conviction for kidnapping must be set aside on this second ground of prejudicial error.

### C.

█ The last ground of error concerning the kidnapping instruction that we address is the Trial Court's failure to instruct the jury that the defendant had to act intentionally with respect to all elements of the kidnapping charge. A proper jury in-

---

**9.** *See also Flamer v. State,* Del.Supr., 490 A.2d 104, 128, *cert. denied,* 464 U.S. 865, 104 S.Ct. 198, 78 L.Ed.2d 173 (1983) ("a defendant is not entitled to a particular instruction, but he does have the unqualified right to a correct statement of the substance of the law").

struction on the statutory offense of kidnapping, 11 *Del.C.* § 783, necessarily requires a finding of intentional action through the definition of "restrain" as defined under 11 *Del.C.* § 786. *See Key v. State*, Del.Supr., 463 A.2d 633, 641 (1983). This, in turn, requires the Trial Court to define the term "intentionally" found in section 786 by reference to 11 *Del.C.* § 231(a).[10] Here, the indictment of defendant included the element of intent, charging that defendant "did intentionally and unlawfully restrain [victim] with intent to violate her sexually and did not voluntarily release her unharmed and in a safe place prior to trial." Yet, in its instructions on the charge of kidnapping in the first degree, the Court did not inform the jury that to convict it must find defendant to have acted knowingly or intentionally with respect to each of the elements of the offense, nor did the Court define those terms consistent with section 231. We cannot agree with the State that the Court satisfied its duty by simply reading to the jury the language of section 783A, followed by the language of section 786(a) defining the term "restrain." This is not to say an intent may not be inferred or need be shown by direct proof. 11 *Del.C.* § 307. *See Deputy v. State*, Del.Supr., 500 A.2d 581 (1985).

# V

Defendant next contends that the Trial Court's instructions on rape, though not objected to at trial, were fundamentally erroneous in two respects: *one*, for failure of the Court to distinguish adequately the elements of rape in the second degree (formerly 11 *Del.C.* § 763) from rape in the first degree (formerly 11 *Del.C.* § 764);[11] and *two*, section 764's term "voluntary social companion" was unconstitutionally vague in the absence of definition. We find no merit to either contention. The Trial Court's instructions on the then controlling statutory offenses of rape in the second degree and rape in the first degree and their elements were correct as a matter of law; and the Court's failure to give an unrequested definition of the quoted term of section 764 did not leave the term or the offense of rape one so vague as to be violative of due process.

The Trial Court instructed the jury that a conviction of rape in the first degree required a finding that the victim was not the defendant's voluntary social companion *and* that she had not previously permitted him sexual contact. The instruction, therefore, was consistent with then section 764(2), *supra*. *Cf. Taylor v. State*, Del.

---

10. Section 231 provides, in relevant part, as follows:

**§ 231. Definitions relating to state of mind.**
(a) *"Intentionally"*.—A person acts intentionally with respect to an element of an offense when:
(1) If the element involves the nature of his conduct or as a result thereof, it is his conscious object to engage in conduct of that nature or to cause that result; and
(2) If the element involves the attendant circumstances, he is aware of the existence of such circumstances or believes or hopes that they exist.
(b) *"Knowingly"*.—A person acts · knowingly with respect to an element of his offense when:
(1) If the element involves the nature of his conduct or the attendant circumstances, he is aware that his conduct is of that nature or that such circumstances exist; and
(2) If the element involves a result of his conduct, he is aware that it is practically certain that his conduct will cause that result.

11. Former section 763 provided:
**§ 763. Rape in the second degree; class B felony.**
A male is guilty of rape in the second degree when he intentionally engages in sexual intercourse with a female without her consent.
Rape in the second degree is a class B felony.
Former section 764 provided:
**§ 764. Rape in the first degree; class A felony.**
A male is guilty of rape in the first degree when he intentionally engages in sexual intercourse with a female without her consent, and:
(1) In the course of the offense he inflicts serious physical, mental or emotional injury upon the victim, or
(2) The victim was not the defendant's voluntary social companion on the occasion of the crime and had not previously permitted him sexual contact.
By 65 Del.Laws, c. 494, effective July 1986, Subpart D, §§ 761 through 773, was replaced by new Subpart D, §§ 761 through 775.

Supr., 464 A.2d 897, 899 (1983). The instruction also adhered to the Superior Court Pattern Jury Instruction concerning the requisite elements for elevating a rape two offense to that of rape in the first degree: that "on the occasion of the crime, [victim] was not the defendant's voluntary social companion and had not previously permitted him sexual contact." Furthermore, there is no evidence in the record to show that the instruction, considered in its entirety, led to confusion concerning the essential elements of the crime charged. *See Hall v. State*, Del.Supr., 431 A.2d 1258, 1260 (1981); *Jenkins v. State*, Del.Supr., 305 A.2d 610, 617 (1973). Here, there is no contention that victim had ever previously permitted defendant sexual contact. The victim and defendant had never previously met.

We turn to defendant's remaining contention of plain error—that, as applied to defendant, the rape one statute was unconstitutionally vague without a more explicit definition of "voluntary social companion." Our standard for judging a statute against a claim of vagueness is well established: "that the statute must be drawn with sufficient specificity and clarity so as to inform a person of reasonable intelligence of the conduct which is proscribed." *Upshur v. State*, Del.Supr., 420 A.2d 165, 168 (1980). The statute must be sufficiently definite to avoid arbitrary and discriminatory enforcement. *Kolender v. Lawson*, 461 U.S. 352, 357, 103 S.Ct. 1855, 1858, 75 L.Ed.2d 903 (1983). Since we are not concerned with the statute implicating "constitutionally protected conduct," a challenge of vagueness must be determined in light of the facts of the given case. *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 494–95, 102 S.Ct. 1186, 1191, 71 L.Ed.2d 362 (1982); *Tackett v. State*, Del.Supr., 416 A.2d 1225, 1227 (1980).

■■■ Here, the victim was clearly a stranger to defendant when he, in the early hours of the morning on an admitted pretext, persuaded victim to play the role of a good Samaritan in a clearly non-social circumstance. Under the facts of this case, the term "voluntary social companion" required no further definition for a rational trier of fact to reasonably apply the facts to the statutes in issue, sections 763 and 764. *Cf. Allen v. State*, Del.Supr., 453 A.2d 1166, 1169 (1982). ("A ten minute conversation with a person who unilaterally decided to walk a few blocks with someone does not make these people voluntary social companions.") Hence, we decline to find the Trial Court to have committed plain error in failing to define a statutory term that at the time was not defined in the Delaware Criminal Code and, hence, was given "its commonly accepted meaning." 11 *Del.C.* § 221(c).[12]

## VI

■■■ Defendant's final contention—that the evidence was insufficient to sustain a finding of rape one because the victim was his voluntary social companion—is foreclosed by our previous review of the record. Further, defendant admitted that he had sexual intercourse with the victim and that she had not previously permitted him sexual contact. Our standard of review is whether, after reviewing the evidence in a light most favorable to the State, any rational trier of fact could have found the

---

12. We note that the Legislature, in its extensive revision in 1986 of Delaware statute law on sexual offenses, has included a definition of "voluntary social companion." Recently enacted 11 *Del.C.* § 761(h) defines the term as meaning "a victim who is in the defendant's company on the occasion of the offense as a result of the victim's exercise of rational intellect and free will, *without trick, coercion or duress.* A victim who is less than 16 years of age, or who is mentally defective, is not the voluntary social companion of a defendant in whose custody or care the victim is placed." (underlining added). Had this definition been part of Delaware statute law at the time of the offense in question, a rational trier of fact could not have found the victim to have been defendant's "voluntary social companion."

essential elements of rape one beyond a reasonable doubt. *Davis v. State,* Del. Supr., 453 A.2d 802, 803 (1982). So viewed, the evidence was more than adequate to sustain defendant's conviction of rape in the first degree.

\* \* \*

AFFIRMED in part; REVERSED in part; and REMANDED for a new trial.