**Daniel COLEMAN, Defendant Below, Appellant,**

v.

**STATE of Delaware, Plaintiff Below, Appellee.**

Supreme Court of Delaware.

Submitted: June 13, 1989.
Decided: July 17, 1989.
Rehearing Denied Aug. 21, 1989.

John S. Malik, Wilmington, and Sylvia E. Hall (argued), Pennsville, N.J., for defendant below, appellant.

Timothy J. Donovan, Jr. (argued), and Ferris Wharton, Deputy Attys. Gen., Wilmington, for plaintiff below, appellee.

Before CHRISTIE, C.J., HORSEY and HOLLAND, JJ.

HOLLAND, Justice:

The defendant-appellant, Daniel Coleman ("Coleman"), was indicted on two counts of Kidnapping in the First Degree (11 *Del.C.* § 783A), one count of Robbery in the First Degree (11 *Del.C.* § 832), and one count of Unlawful Sexual Contact in the Third Degree (11 *Del.C.* § 767). Coleman was tried before a jury in the Superior Court of the State of Delaware, in and for New Castle County. The jury found Coleman guilty as charged in all of the counts of the indictment except Robbery in the First Degree, for which Coleman was convicted of the lesser-included offense of Robbery in the Second Degree (11 *Del.C.* § 831).

Coleman was sentenced to be imprisoned for life on each conviction of Kidnapping in the First Degree, five years for the conviction of Robbery in the Second Degree, and two years for the conviction of Unlawful Sexual Contact in the Third Degree. All of the sentences are to be served consecutively by Coleman. On November 19, 1987, Coleman filed a timely direct appeal to this Court.[1]

Coleman has raised five issues on appeal. He argues, through his attorney, that (1) his identification by two police officers should have been suppressed because the police violated his Fourth Amendment rights when they initially stopped him solely upon the basis of his race and without any reasonable suspicion of criminal activity; (2) the Superior Court committed plain error when it denied his motion to suppress inculpatory statements which he made following a warrantless arrest unsupported by probable cause; (3) the admission of testimony in the pretrial suppression hearing about his alleged involvement in anoth-

---

1. On December 14, 1987, Coleman filed a motion for a reduction of sentence in the Superior Court. This Court remanded Coleman's case to the Superior Court for a decision on that motion. The Superior Court, in a letter opinion dated October 7, 1988, concluded that "the restraint used by the defendant incident to the robbery does not qualify as kidnapping." Accordingly, the Superior Court withdrew one of the two life sentences which had been imposed.

er unrelated and uncharged crime was prejudicial error; (4) the Superior Court violated his Sixth Amendment right to a trial before an impartial jury, by allowing an allegedly biased juror to sit and deliberate his case; and (5) the Superior Court's instructions to the jury on the kidnapping charges were inadequate with respect to the element of "restraint" that was required to support a conviction. We find no merit in any of Coleman's contentions.

### Facts

The victim testified that on February 21, 1987, at approximately 4:15 a.m., she attempted to withdraw money from an automatic teller machine on Main Street in Newark, Delaware. While she was operating the teller machine, but before completing her transaction, the victim was grabbed from behind by a man who said, "this is a stick-up" and "I want your money." After a brief struggle, during which the man pressed a "hard ... blunt object" into her back, the victim was forced from the front of the bank to a parking lot in back of the bank. The victim gave what money she had to the man.

According to the victim, the man then demanded that she perform fellatio. However, almost immediately, the man changed his mind and said that "he knew of a better place." He forced the victim to walk back to the front of the bank and ordered the victim to get into the driver's seat of her car by threatening to "blow [her] brains out" if she did not comply. The man positioned himself next to the victim in the front passenger seat. The man then directed the victim where to drive the car.

As they were riding in the car, the man told the victim again that he intended to have her perform fellatio. He also rubbed the victim's thighs and forced her to rub his genital area. As she was driving, the victim noticed a pizza shop that appeared to be open. She accelerated the car in that direction and jumped the curb. She was able to get out of the car and ran screaming for help. Several people emerged from the shop. During the confusion, the assailant walked away.

The police were called, and arrived at the pizza shop shortly thereafter, at approximately 4:30 a.m. According to the first investigating officer, Officer Corcoran, the victim described her assailant as a "black male 5' 11" to 6 feet two inches wearing a ski cap, had a mustache, was wearing a light-colored coat, dark pants, white tennis shoes and had medium to dark skin."

At approximately 5:25 a.m., another officer, having received a description of the assailant from Officer Corcoran, stopped Coleman in the parking lot of a restaurant located approximately one-half of a mile from the pizza shop. According to police testimony, Coleman fit the general description of the assailant, except for the facts that he had a goatee as well as a mustache and was not wearing a coat or a cap. Coleman was questioned briefly about his identity and destination. Coleman stated that he was coming from his girlfriend's home and that he was on his way to work. During this discussion, Officer Corcoran drove by with the victim. She was unable to identify Coleman as her assailant. Coleman was detained no further at that time.

Later that morning, the police viewed a videotape taken by a camera which had been installed by the bank near the automatic teller machine. Both of the police officers who had seen Coleman earlier that morning during his brief detention viewed the videotape and identified the assailant on the videotape as Coleman. Coleman was arrested, without a warrant, later that same morning at his place of employment.

According to police testimony at trial, Coleman gave several statements, after being informed of his Miranda rights. At first, Coleman said he was at home in bed at the time of the crimes. Then, Coleman said that he and the victim met at the bank, that she consented to leaving with him, and that they had consensual sexual intercourse. During this statement, the police testified that Coleman admitted wearing a tan jacket with a hood and leaving it over a trash can.

The police then showed Coleman still photographs that had been taken from the videotape of the incident at the bank's au-

tomatic teller machine. According to the police officers' testimony, upon viewing the photographs, Coleman confessed to the crimes. Coleman admitted grabbing the victim, forcing her to go behind the bank, taking her money, and ordering her to drive around in her car. However, after a recess in the questioning, Coleman recanted these statements and once again asserted that he was home in bed at the time of the crimes.

Coleman testified at his trial. He denied any involvement in the crimes. He testified that at the time of the crimes, he was asleep in bed with his girlfriend at his girlfriend's house. Coleman's girlfriend also testified and corroborated his testimony.

### Investigatory Detention

■ Coleman contends that the police violated his Fourth Amendment right to be free from unreasonable searches and seizures when they stopped and detained him for questioning in the restaurant parking lot. Coleman argues that the police stopped him solely on the basis of his race. In support of this position, Coleman argues that the police lacked a reasonable basis to suspect that he had been involved in any criminal activity.

It is. a well settled principle of law that police have the authority to forcibly stop and detain a person if the police have a "reasonable suspicion" of criminal activity on the part of that person. *See Terry v. Ohio*, 392 U.S. 1, 22, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889 (1968). *United States v. Place*, 462 U.S. 696, 702, 103 S.Ct. 2637, 2642, 77 L.Ed.2d 110 (1983).[2] *See Byrd v. State*, Del.Supr., 458 A.2d 23, 25 (1983); *see also* 11 *Del.C.* § 1902.[3] *Cf. Delaware v. Prouse*, Del.Supr., 382 A.2d 1359 (1978) *aff'd*, 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979). "Reasonable suspicion" has been defined as the officer's ability to "point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant th[e] intrusion." *Terry v. Ohio*, 392 U.S. at 21, 88 S.Ct. at 1880.[4] This Court has held that the quantum of evidence necessary for reasonable suspicion is less than that which is required for probable cause to arrest. *State v. Deputy*, Del.Supr., 433 A.2d 1040, 1043 (1981), *appeal after remand*, Del.Supr., 500 A.2d 581 (1985), *cert. denied*, 480 U.S. 940, 107 S.Ct. 1589, 94 L.Ed.2d 778 (1987).

In this case, the victim gave a general description of her assailant to the first police officer on the scene. Less than one hour after the crimes, a second police officer, who had learned of the suspect's description from the first officer, observed Coleman in the parking lot of a restaurant approximately one-half of a mile from the crime scene. Coleman fit the general description of the assailant[5] except for the

---

**2.** This includes persons suspected of involvement in completed crimes. *United States v. Hensley*, 469 U.S. 221, 227, 105 S.Ct. 675, 679, 83 L.Ed.2d 604 (1985).

**3.** These principles have been codified in Delaware. 11 *Del.C.* § 1902 provides:
(a) A peace officer may stop any person abroad, or in a public place, who he has reasonable ground to suspect is committing, has committed or is about to commit a crime, and may demand of him his name, address, business abroad and where he is going.
(b) Any person so questioned who fails to identify himself or explain his actions to the satisfaction of the officer may be detained and further questioned and investigated.
(c) The total period of detention provided for by this section shall not exceed 2 hours. The detention is not an arrest and shall not be recorded as an arrest in any official record. At the end of the detention the person so

detained shall be released or be arrested and charged with a crime.

**4.** In a "balancing of the interests" test, the United States Supreme Court has determined that the intrusion on a person which results from a stop and brief investigatory detention supported by reasonable suspicion is outweighed by the government's interests in "crime prevention", *Terry v. Ohio*, 392 U.S. at 22, 88 S.Ct. at 1880, and "solving crimes and bringing offenders to justice." *United States v. Hensley*, 469 U.S. at 229, 105 S.Ct. at 680.

**5.** The officer who stopped Coleman testified that the description of the suspect which he had received was "a black male, about six foot two in height, facial hair, wearing a military style jacket and ski cap hat." Coleman is a black male, 5'10 in height with a thin mustache and goatee. At the time of the stop, he was not wearing a jacket or a cap. Following a suppres-

facts that he had a goatee and was not wearing a jacket or cap.[6]

Coleman argues that he was detained solely on the basis of his race, and that such practice is arbitrary and discriminatory.[7] The majority of Courts have held that race, as a single criteria, provides an insufficient basis for the detention or arrest of a suspect. *Development in the Law—Race and the Criminal Process*, 101 Harv.L. Rev. 1494, 1501 (1988).[8] Generally, however, courts have upheld the use of race as an identifying factor when the totality of the circumstances reveals other nonracial factors. *Id.* at 1502. This Court has held that the improper injection of race into a criminal proceeding violates a defendant's right to due process as guaranteed by the Constitution of this State. *Feddiman v. State*, Del.Supr., 558 A.2d 278 (1989).

However, we find that "the use of race may be legitimate when it is one among several factors suggestive of criminality." *Development in the Law—Race and the Criminal Process*, 101 Harv.L.Rev. 1494, 1501 (1988).[9]

In this case, the officer who detained Coleman had received information concerning not only the race of the suspect, but gender, approximate height, and indications of facial hair. In addition, the location of the suspect, and the fact that he was not wearing a coat were legitimate factors to be considered.[10] We conclude that the record clearly supports the State's assertion that more than one factor aroused suspicion on the part of the police, resulting in Coleman's detention, and that Coleman was not arbitrarily or discriminatorily

---

sion hearing, held to determine whether Coleman's eventual arrest was supported by probable cause, the Superior Court found that the "officers had a description [of the suspect] which fairly closely covered the defendant's physical parameters."

**6.** The police officer who stopped Coleman testified implicitly that he thought it was suspicious that Coleman was *not* wearing a jacket in very cold weather, i.e., 20 to 25 degrees Fahrenheit.

**7.** Coleman refers to the following testimony given by an officer not involved in Coleman's stop, during the suppression hearing:

Q. Wouldn't it be fair to say that you would have stopped—that the police officers in Newark would have stopped any black male walking down the street in the vicinity of the robbery that morning?

A. Yes, that would have been a practice.

**8.** *See also United States v. Nicholas*, 448 F.2d 622, 625 (8th Cir.1971) (stopping defendant on suspicion that any black person driving an automobile with out-of-state license plates might be engaged in criminal activity is unreasonable and violative of the Fourth Amendment); *United States v. Carrizoza–Gaxiola*, 523 F.2d 239 (9th Cir.1975) (fact that defendant of Mexican descent was driving a new car in an area of frequent thefts does not provide founded suspicion for an investigatory stop); *United States v. Beck*, 602 F.2d 726 (5th Cir.1979) (two black males parked in a car with engine running does not justify a stop). *See also Davis v. Mississippi*, 394 U.S. 721, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969) (involving police interrogation of 40 or 50 Negro youths at police headquarters, school, and on the street after a rape where the description of the assailant was "a Negro youth").

**9.** One commentator describes the use of race in identifying suspects:

When police are given a list of characteristics that describe the perpetrator of a reported crime, courts allow police to use the race of the described individual as a legitimate basis for identifying potential suspects. In contrast to the scenario in which police use race as a factor in initiating surveillance or suspecting an individual for an unreported crime, courts quite sensibly permit police to identify potential suspects of a reported crime on the grounds that these suspects, *along with other factors,* meet the racial description of the actual criminal. *Development in the Law—Race and the Criminal Process,* 101 Harv.L.Rev. 1494, 1505 (1988) (emphasis added). *See also* Johnson, *Race and the Decision to Detain a Suspect,* 93 Yale L.J. 214, 225–30 (1983); *Stewart v. State,* Del.Supr., 409 A.2d 1052, 1055 (1979) (reasonable police conduct in an investigatory detention included consideration of "defendant's size, physique, *race* and appearance"). *United States v. Thomas,* 863 F.2d 622, 625–28 (9th Cir.1988) (police officer justified in stopping suspects after weighing several factors, i.e., age, sex, *race,* number of suspects, location of stop, etc.); *United States v. Williams,* 714 F.2d 777, 780 (8th Cir.1983) (police officer justified in stopping suspects after a consideration of race as an identifying factor and other "articulable objective facts", despite discrepancies in the suspect's gender and car description); *Cf. State v. Dean,* 112 Ariz. 437, 543 P.2d 425 (Ariz.1975).

**10.** *Cf. United States v. Williams,* 714 F.2d 777, 780–81 (8th Cir.1983) (valid investigatory detention included consideration of the fact that heavy clothing on a warm day was "unusual").

detained solely on the basis of his race. *Stewart v. State*, Del.Supr., 409 A.2d 1052, 1055 (1979).

■ We also find that the record supports the conclusion that, given the totality of the circumstances, the police had "reasonable suspicion" to stop Coleman.[11] The police had knowledge that a felony had just been committed. *See Buckingham v. State*, Del.Supr., 482 A.2d 327, 332 (1984). They also knew that the assailant had fled the scene on foot, and was likely to still be in the area. Due to the early hour of the morning, few people would have reason to be out walking on the streets. *See id.* These objective facts "when used by trained law enforcement officers ... can be combined with permissible deductions from such facts to form a legitimate basis for suspicion of a particular person and for action on that suspicion." *United States v. Cortez*, 449 U.S. 411, 419, 101 S.Ct. 690, 695–96, 66 L.Ed.2d 621 (1981).[12] We find that when the police observed a man, fitting generally, though not exactly, the description of the suspect, on foot, within one-half of a mile of the crime scene, they were justified in stopping and detaining him. We conclude that the police in this case had a reasonable basis for their suspicion that the individual they observed may have been involved in the prior criminal activity and, hence, the stop of Coleman

was "justified in its inception." *Terry v. Ohio*, 392 U.S. at 19–20, 88 S.Ct. at 1878–79; *Stewart v. State*, 409 A.2d at 1055.

■ In addition to the requirement of "reasonable suspicion," an investigatory detention must be "reasonably related in scope to the circumstances which justified the interference in the first place." *Terry v. Ohio*, 392 U.S. at 20, 88 S.Ct. at 1879. In this case, Coleman was detained for approximately ten minutes. *See United States v. Sharpe*, 470 U.S. 675, 686–88, 105 S.Ct. 1568, 1575–77, 84 L.Ed.2d 605 (1985) (twenty-minute stop not unreasonable; no *per se* time limit on investigatory detentions). *Cf. State v. Deputy*, 433 A.2d at 1041–43. After being told by the police officer that he was investigating a crime recently committed in the area, Coleman was asked to identify himself and state his destination.[13] Coleman answered accordingly and was then permitted to go on his way.[14] Coleman was not removed from the area, nor was he taken to the station house.[15] Coleman was never even aware that the victim drove by with another police officer for purposes of a possible identification. We conclude that Coleman's detention was minimally intrusive and "reasonably related in scope to the circumstances which justified the interference." *Terry v. Ohio*, 392 U.S. at 20, 88 S.Ct. at 1879.

11. In determining what constitutes "reasonable suspicion," courts have, in essence, applied a "totality of the circumstances" analysis. *United States v. Cortez*, 449 U.S. 411, 417, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981). *See Stewart v. State*, 409 A.2d at 1055; *State v. Deputy*, 433 A.2d 1043–44.

12. In their analyses, courts have given great deference to the observations and conclusions of trained and experienced police officers. *United States v. Cortez*, 449 U.S. at 419, 101 S.Ct. at 695. A police officer's own observations can be the basis of reasonable suspicion, as can be the "collective knowledge of all law enforcement personnel involved in [an] investigation." *Project: Seventeenth Annual Review of Criminal Procedure*, 76 Geo.L.J. 562 (1988). *See United States v. Hensley*, 469 U.S. at 232, 105 S.Ct. at 682. *See also United States v. Sharpe*, 470 U.S. 675, 682 & n. 3, 105 S.Ct. 1568, 1573 & n. 3, 84 L.Ed.2d 605 (1985); *Terry v. Ohio*, 392 U.S. at 22, 88 S.Ct. at 1880–81; *Goldsmith v. State*, Del.

Supr., 405 A.2d 109, 112 (1979); *United States v. Magda*, 547 F.2d 756 (2d Cir.1976), *cert. denied*, 434 U.S. 878, 98 S.Ct. 230, 54 L.Ed.2d 157 (1977); *see United States v. Hawkins*, 811 F.2d 210, 215 (3d Cir.), *cert. denied*, 484 U.S. 833, 108 S.Ct. 110, 98 L.Ed.2d 69 (1987).

13. *See Terry v. Ohio*, 392 U.S. at 6–7, 21–22, 88 S.Ct. at 1879–80; *Adams v. Williams*, 407 U.S. 143, 146, 92 S.Ct. 1921, 1923, 32 L.Ed.2d 612 (1972); *Cf. United States v. Poitier*, 818 F.2d 679, 683 (8th Cir.) *cert. denied*, 484 U.S. 1006, 108 S.Ct. 700, 98 L.Ed.2d 651 (1988).

14. Police testified that Coleman told them he was on his way to work. However, police noted that at the time of the stop, Coleman was walking in the opposite direction of his place of employment.

15. *See Dunaway v. New York*, 442 U.S. 200, 216, 99 S.Ct. 2248, 2258, 60 L.Ed.2d 824 (1979). *Cf. State v. Deputy*, 433 A.2d at 1043–44.

*Coleman's Arrest*

On July 13, 1987, a hearing was held by the Superior Court on Coleman's motion to suppress the statements that he had given to the police. *See* Super.Ct.Crim.R. 41(e), 47(b). At the conclusion of the suppression hearing, Coleman's motion was denied. Coleman argues that the Superior Court committed plain error when it denied his motion to suppress the statements which he made following his arrest. Coleman contends that the police lacked "probable cause" to arrest him, rendering his warrantless arrest illegal and, his statements given as a consequence of that illegal arrest inadmissible.

A warrantless arrest by a police officer is lawful whenever there is "reasonable ground to believe that the person to be arrested has committed a felony." 11 *Del.C.* § 1904(b)(1). This Court has held that " 'reasonable ground to believe' is ... the legal equivalent of 'probable cause' and should be accorded the same meaning." *Thompson v. State*, Del.Supr., 539 A.2d 1052, 1055 (1988). In addition, this Court has described probable cause for a warrantless arrest as a " 'practical, nontechnical conception.' " *Id.* (quoting *Illinois v. Gates*, 462 U.S. 213, 231, 103 S.Ct. 2317, 2328, 76 L.Ed.2d 527, *reh'g denied*, 463 U.S. 1237, 104 S.Ct. 33, 77 L.Ed.2d 1453 (1983)). The requisite analysis in determining the sufficiency of probable cause for a warrantless arrest is determined according to a "totality of the circumstances" test. *Id.* (citing *Illinois v. Gates*, 462 U.S. at 231, 103 S.Ct. at 2328).

■ In this case, the issue is whether the police had probable cause to believe that Coleman had committed the felony offenses for which he was eventually indicted. Two police officers, who had seen Coleman during the valid investigatory detention, viewed the bank's videotape of the crimes and identified Coleman as the assailant. Coleman argues that the videotape was blurred and not clear enough to permit a proper identification. The trial judge considered the police identifications of Coleman from the videotape in making his ruling following the suppression hearing and found their testimony to be credible, notwithstanding the videotape's imperfections.

Coleman also argues that the observation of a suspect with a jacket behind the Newark Police Department shortly after his detention and release precluded a determination of probable cause for his arrest.[16] Coleman asserts that there was insufficient time for him to have walked from the restaurant parking lot to the area behind the police station. In support of his position, Coleman correctly points out that the testimony by the police officers was in conflict on that issue. One police officer testified that there was sufficient time and one concluded otherwise, speculating that another suspect was involved. The trial judge weighed all of the testimony during the suppression hearing and found that these apparent conflicts did not negate what was otherwise probable cause for Coleman's arrest. *See Williams v. State*, Del.Supr., 539 A.2d 164, 169 (1988).

"It has long been our law that the [trier of fact, in this setting, the trial judge] is the sole judge of the credibility of the witnesses and responsible for resolving conflicts in the testimony." *Tyre v. State*, Del.Supr., 412 A.2d 326, 330 (1980). In this case, in addition to assessing the credibility of the witnesses, the trial judge weighed the other evidence and concluded that it supported a determination of probable cause, i.e., the description of the assailant as compared to Coleman's appearance at the time of the initial stop, Coleman's failure to "give a good account of his presence" when initially detained by police[17], and the fact that Coleman was not wearing a coat in very cold weather.[18]

---

**16.** According to a third officer's testimony, approximately five to ten minutes after Coleman was released, a man fitting the description of the assailant was observed behind the Newark Police Department. The man had a jacket draped over his shoulder. Following a search of the area, a jacket was found, which, according to police, was later identified by the victim as being the jacket worn by her assailant.

**17.** *See supra* note 14.

**18.** *See supra* notes 6 and 10.

The Superior Court reviewed the totality of the circumstances which were known to the police prior to Coleman's warrantless arrest. *Thompson v. State*, 539 A.2d at 1055–56, 1059. The record supports the Superior Court's conclusion that Coleman's arrest was based upon sufficient probable cause. We find that the Superior Court followed the correct legal analysis and committed no reversible error. *Id.* at 1059. Therefore, we find that the Superior Court properly denied the motion to suppress the statements which Coleman gave to the police following his arrest.

### "Other Crimes" Testimony at Suppression Hearing

■ Coleman argues that testimony given at his pretrial suppression hearing concerning a rape for which he was not charged, which had occurred on the same day in the same vicinity, but involving a different victim was unfair and prejudicial. The testimony to which Coleman objects was elicited by Coleman's attorney during the cross-examination of the arresting officer. Coleman's attorney asked why the police did not obtain a warrant before arresting Coleman. The officer answered that he did not obtain a warrant because, at the time, the police suspected Coleman's involvement in the rape and were concerned with the need for immediate action to preserve possible physical evidence relating to that crime.

Evidence of "other crimes, wrongs or acts" by a defendant is inadmissible in a proceeding to prove the propensity of the defendant to act in a criminal nature. D.R.E. 404(b). *Getz v. State*, Del.Supr., 538 A.2d 726, 730 (1988). Nevertheless, this Court has adopted the inclusionary approach in interpreting D.R.E. 404(b). *Id.* at 731.[19] Under the inclusionary approach, evidence of prior bad acts is admissible not only if it fits within the enumerated exceptions of D.R.E. 404(b), but also if "it has independent logical relevance" and when

its probative value is not substantially outweighed by the danger of unfair prejudice." *Id. See* D.R.E. 403. The rationale underlying D.R.E. 404(b) is to prevent the trier of fact from taking the uncharged "other crimes" evidence as proof of guilt of the crime charged. *Getz v. State*, 538 A.2d at 730 (citing 1A Wigmore, *Evidence*, § 58.2, at 1212–13 (Tillers rev. 1983)).

In this case, evidence of the rape was logically relevant to the material facts surrounding the issue of Coleman's warrantless arrest. Moreover, by its very nature, the *pretrial* suppression hearing was conducted out of the presence of the jury. Therefore, the jury, as the trier of fact at trial, was never made aware of the uncharged crime. Coleman has been unable to articulate or demonstrate any prejudice to his case from this pretrial testimony. Accordingly, we find that the "other crimes" testimony, which was admitted during the pretrial suppression hearing, did not constitute reversible error.

### Juror Bias

■ Coleman contends that his Sixth Amendment right to a trial by an impartial jury was violated when the Superior Court allowed an allegedly biased juror to remain on the jury panel in his case. This contention is based upon the fact that during the trial, one of the jurors informed the trial judge, via the bailiff, that she was a receptionist in a doctor's office and that her employer may have treated the victim's father as a patient. The trial judge, after being made aware of the potential conflict, promptly brought the matter to the attention of both attorneys.

The trial judge asked the prosecutor and Coleman's attorney if they wished him to take any action. The prosecutor stated that he would try to ascertain through the victim whether the patient and her father were one and the same person. Coleman's attorney agreed with this course of action.

---

**19.** D.R.E. 404(b) provides:

Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident.

The record discloses no further mention of this juror.

Coleman, through his attorney, never requested voir dire of the juror, nor did he seek to have the juror removed from the panel. Having made no attempt in the Superior Court to correct what he now contends was an error of law, Coleman must show plain error and a "miscarriage of justice." *Michael v. State*, Del.Supr., 529 A.2d 752, 764 (1987); Supr.Ct.R. 8. We find that the record is devoid of any evidence to support a conclusion that Coleman has sustained that burden. If the impact on Coleman's trial was as severe as is now claimed on appeal, "the [t]rial [j]udge's attention should have been directed to such impact." *Craig v. State*, Del.Supr., 457 A.2d 755, 762 (1983). This issue was not fairly presented to the Superior Court and, therefore, is not a proper subject of review by this Court. *Id.*; Supr.Ct.R. 8.

### *Jury Instruction on the Kidnapping Charge*

This Court has held that under Delaware's kidnapping statute, 11 *Del.C.* § 783A, "the requirement that the defendant 'interfere substantially' with the victim's liberty insures that where movement or restraint is entirely incidental to the underlying crime, there cannot be a kidnapping conviction." *Burton v. State*, Del. Supr., 426 A.2d 829, 834 (1981). Coleman contends that the Superior Court committed plain error when it failed to instruct the jury that the element of "restraint" in the kidnapping statute, 11 *Del.C.* § 783A [20], requires proof of "substantial interference", i.e., interference that is independent of and not incidental to the underlying crimes.

The underlying crime in this case was unlawful sexual contact. Coleman asserts that the only evidence of restraint present-

ed by the State in support of the kidnapping charge was entirely incidental to the sexual assault.[21] Coleman argues that a specific jury instruction was not only necessary but mandatory to assure him a fair trial on both charges. Coleman relies on this Court's decision in *Weber v. State*, Del.Supr., 547 A.2d 948 (1988).

■ In *Weber*, this Court held that "in every case when a defendant is charged with kidnapping in conjunction with an underlying crime, a specific instruction requiring the jury to find that the movement and/or restraint is independent of and not incidental to the underlying crime is mandatory." *Id.* at 959. The *Weber* decision does not support Coleman's argument, however, because the jury instruction in kidnapping cases which was made mandatory in *Weber* operates *prospectively* only. *Id.*[22] Cases, like Coleman's, which were tried preceding *Weber*, must be reviewed according to the plain error standard which was applied by this Court in *Burton v. State*, Del.Supr., 426 A.2d 829 (1981) and *Scott v. State*, Del.Supr., 521 A.2d 235 (1987).

■ "In *Burton*, the kidnapping occurred after the victim was first raped when her liberty was substantially interfered with by detaining her for the purpose of raping her again." *Weber v. State*, 547 A.2d at 958. In *Burton*, we concluded that "the record ... manifestly support[ed] a finding of 'substantial' interference with the victim's liberty." *Burton v. State*, 426 A.2d at 835. Therefore, we held that no specific jury instruction was required. *Id.*

However, subsequent to *Burton*, under different circumstances, this Court held that a specific instruction requiring the jury to find proof of more interference than

---

**20.** 11 *Del.C.* § 783A provides, in pertinent part:
  A person is guilty of kidnapping in the first degree when he unlawfully restrains another person with any of the following purposes:
  ....
    (4) To inflict physical injury upon him or to violate or abuse him sexually;
  and the actor does not voluntarily release the victim alive, unharmed and in a safe place prior to trial.

**21.** *See supra* note 1.

**22.** *See also Howard v. State*, Del.Supr., 549 A.2d 692, 694–95 (1988) (limiting instruction when evidence of prior crimes is admitted operates prospectively).

is ordinarily incident to the underlying crime of rape was necessary to assure the defendant a fair trial on both charges. *Scott v. State,* 521 A.2d at 243. In *Scott,* the defendant, Mr. Scott, was a motorist who was stranded by the roadside when his car would not start. The victim voluntarily agreed to drive Mr. Scott several miles to his home to get some jumper cables. The victim waited outside in her car when Mr. Scott went into his house. When Mr. Scott returned from his house without the jumper cables, he demanded the victim's car keys, told her that he was going to assault her sexually, and ordered the victim to get into the back seat of the car. "[T]he victim conceded at trial that until she was forced to move from the front to the back seat of the car, she had remained voluntarily with [Mr. Scott]." *Id.* This Court held:

> So viewed, the facts arguably do not support a finding of "substantial interference." Under the circumstances, the Trial Court was obliged to instruct the jury that a conviction of kidnapping would require proof of more interference than is ordinarily incident to the crime of rape. In our view, such an instruction was necessary to enable a jury intelligently to perform its duty when returning a verdict as to both rape and kidnapping. The failure to give such an instruction was reversible error.

*Id.* (citation omitted).

In Coleman's case, the victim's actions were involuntary *ab initio.* Coleman told the victim that he intended to assault her sexually when they were behind the bank. Coleman forced the victim to the front of the bank and into her car, under a threat of death. Coleman then forced the victim to drive her car under the same threat of death and repeated his intention to assault the victim sexually.

The record reflects that Coleman did have unlawful sexual contact with the victim during the ride in her car. However, the facts of this case also clearly establish that the restraint imposed on the victim by Coleman was substantial interference with the victim's liberty in excess of the restraint ordinarily incident to the underlying crime of unlawful sexual contact, of which he was also charged. *Burton v. State,* 426 A.2d at 835. The Superior Court's failure to specifically instruct the jury that to convict Coleman of kidnapping, it had to find substantial interference with the victim's liberty, independent of and not incidental to the underlying crime of unlawful sexual contact, was not plain and reversible error. *Id.* Cf. *Scott v. State,* 521 A.2d at 242–43. Under the facts of this case, such an instruction was not necessary to assure Coleman of a fair trial on both charges. *Burton v. State,* 426 A.2d at 835. We are satisfied, under the facts in the record before us, that in the absence of a specific instruction, the jury was able to perform its duty when deliberating its verdicts as to the separate charges for kidnapping and unlawful sexual contact. *Id.*

### Conclusion

The judgments of the Superior Court resulting in Coleman's convictions for one count of Kidnapping in the First Degree, one court of Robbery in the Second Degree and one count of Unlawful Sexual Contact in the Third Degree are AFFIRMED.