Richard ROTH, Jr., Defendant
Below, Appellant,

v.

STATE of Delaware, Plaintiff
Below, Appellee.

No. 382, 2000.

Supreme Court of Delaware.

Submitted: Sept. 17, 2001.
Decided: Dec. 21, 2001.

Jerome Capone (argued), Kevin J. O'Connell, Wilmington, for appellant.

Timothy J. Donovan, Jr., Thomas E. Brown (argued), Department of Justice, Wilmington, for appellee.

Before WALSH, HOLLAND and STEELE, Justices.

HOLLAND, Justice:

This is an appeal by the defendant-appellant, Richard Roth, Jr. ("Roth, Jr."), who along with three codefendants was charged with nineteen crimes involving three different robberies. The most serious charge was Murder in the First Degree, relating to the death of Jaime Antunez, who was one of the robbery victims. Mr. Antunez owned and operated the J & R Grocery Store in Newport, Delaware. The other two robbery locations were the Newport Family Restaurant and Bob's Adult Bookstore on Route 13 in New Castle County.

Prior to trial, James Anderson, one of the codefendants, entered into a plea agreement. The plea bargain spared James Anderson from the possibility of the death penalty but required the imposition of a life sentence. James Anderson also agreed to testify "truthfully" for the State at the trial of Roth, Jr. and the other codefendants.

Roth, Jr. was the first of the remaining three defendants to go to trial, with the State seeking an imposition of the death

penalty.[1] During the guilt phase, Roth, Jr. was convicted of the Murder in the First Degree charge and all counts relating to the robberies involving the J & R Grocery Store and Bob's Adult Bookstore. Roth, Jr. was acquitted of all counts relating to the robbery at the Newport Family Restaurant.

Since this was a capital case, Roth, Jr.'s trial then proceeded to the penalty phase. After hearing all the evidence presented for and against the imposition of a death sentence, the jury returned a 9–3 vote that the mitigating factors outweighed the aggravating factors. The Superior Court imposed a life sentence on Roth, Jr. for the Murder in the First Degree conviction and imposed substantial terms of imprisonment for the other convictions.

### Issues on Appeal

Roth, Jr. has raised three issues in this direct appeal. First, he alleges that the trial judge committed an error of law in deciding that the 11 *Del.C.* § 3507 statement of a State's witness, Theresa Anderson, was given voluntarily and, therefore, was admissible evidence. Second, he contends that the trial judge erred in denying a motion to suppress the statement that he made to Detective Corrigan after being taken into custody. Finally, Roth, Jr. claims that the trial judge erred in allowing the State to introduce into evidence the fact that he had a large tattoo of a pistol across his back with the words "No Limit" tattooed underneath.

We have carefully considered each of Roth, Jr.'s arguments. We have concluded that each of the trial judge's rulings

were correct. Therefore, the judgments of the Superior Court are affirmed.

### Facts

Roth, Jr. and three codefendants were charged in connection with a series of robberies occurring in the Newport and Stanton area in December 1998. The codefendants were Richard Roth, Sr., James Anderson and Moises Ordorica.[2] The first robbery occurred on December 22, 1998 at the Newport Family Restaurant. The owner of the restaurant, Maria Perdikis, was robbed as she closed the business and walked to her car with the night deposit bag. An armed robber, wearing a mask and gloves, grabbed her from behind and threatened to kill her if she did not give him the deposit bag. The robber discharged pepper spray into Perdikis' face, and she fell to the ground. The robber then discharged pepper spray into Perdikis' face again. She heard a second man say, "What are you doing?" The robbers fled with the night deposit bag containing approximately $3,000. Perdikis later told the investigating police officer that she had seen three men in the bushes that night but did not remember that statement at trial.

The second robbery occurred on December 26, 1998 at Bob's Adult Bookstore on Route 13. At about 10:00 p.m., the manager of the bookstore, Mitchell Watson, stepped outside to investigate the possibility of a break in the cable line since the television had gone blank and the credit card machine stopped functioning. When Watson opened the door, a man entered the store and said, "Hi Mitch." When Watson turned around, the man was wearing a

---

1.  The State elected to try the remaining three codefendants separately.

2.  Ordorica identified J & R Grocery Store as a good prospect for a robbery and told his codefendants how to say, in Spanish, the words that would convey that they were conducting a robbery. He did not participate in the actual robbery.

mask and pointed a gun at Watson's face. The gunman ordered Watson to step away from the door. A second masked robber entered holding a shotgun. The two gunmen in the store communicated with a third person outside by using a walkie-talkie. The robbers fled with approximately $3,000 and several coffee cans that each contained approximately $100 in quarters or tokens. Mitchell provided a description of the two gunmen to the police. That description, and the descriptions given by other witnesses, was consistent with Roth, Jr. and James Anderson.

The most serious offense occurred during the third armed robbery on New Year's Eve 1998 at the J & R Grocery Store on East Newport Pike. The owner of the store, Jaime Antunez, was working inside the shop with his sister, Marisela Rodriguez. Two gunmen wearing ski masks entered the store. One was armed with a .38 caliber revolver. The other was armed with a sawed-off shotgun and a semiautomatic handgun.

As Antunez struggled with one of the robbers, that gunman's weapon discharged twice. One shot struck that gunman in the hand and the other shot grazed his head. The second robber returned from a back room and fired several shots at Antunez with the semiautomatic handgun. The robbers took money from the cash register, exited the grocery store and entered a getaway car driven by a third person. Antunez survived for fifty-five days before dying from an infection and pneumonia caused by the gunshot wounds that were inflicted during the armed robbery.

A customer arrived at the J & R Grocery Store during the course of the robbery. He could see the masked gunmen inside and did not enter. He provided a description of the gunmen to police. The police found a sawed-off shotgun at the crime scene with a white wood stock and tape on the handle.

### State's Trial Evidence

The State's evidence at trial established that the three men who robbed the J & R Grocery Store had come from and returned to James Anderson's residence in Newport where he lived with his wife, Theresa Anderson. Roth, Jr. went to the Andersons' residence, on New Year's Eve with his mother, Patricia Roth, and his father, Roth, Sr. Several other social guests came and went to the Andersons' home throughout the course of the evening.

In a taped statement to the police, Theresa Anderson said that, on New Year's Eve, she saw her husband depart together with Roth, Sr. and Roth, Jr. and return together with them that evening. When they returned, her husband was staggering and bleeding profusely from his head and hand. Roth, Sr. told Theresa Anderson to have her daughter Brittany removed from the house. Theresa Anderson said that Roth, Jr. was "flipping out." Roth, Jr. said " 'The mother f...er wouldn't drop.' He said he shot him like four or five times and he finally had to kick him over." Theresa Anderson stated that when the three men returned to her house, her husband, James Anderson, did not have a gun; Roth, Sr. had a revolver; and Roth, Jr. had a semiautomatic handgun. Theresa Anderson helped care for her husband's wounds and also cleaned blood off of Roth, Jr.'s gun and money stolen in the robbery. Roth, Jr. hid his gun under the Andersons' couch that evening. He retrieved the gun on the following day.

Theresa Anderson's tape-recorded account to the police was corroborated by other guests at the Andersons' residence, including Patricia Roth's initial statement

to police.[3] Paul Ciccaglione was present at the Andersons' residence on New Year's Eve waiting for his girlfriend, Lisa Laskowski, to pick him up. They left briefly to visit Ciccaglione's cousin and returned. According to Ciccaglione, when they left, the three Roths, including Roth, Jr., were at the Andersons' residence.

Ciccaglione and Laskowski returned to the Andersons' house a short time later. When they returned, Roth, Sr., Roth, Jr. and James Anderson were absent. Following a knock on the door, Ciccaglione was asked to take Brittany away from the house.[4] As he left to take Brittany to his cousin's house, Ciccaglione saw one of the Roths standing by a car.

Ciccaglione testified that when he returned to the Andersons' residence after leaving Brittany at his cousin's house, he saw clothes, ski masks and blood everywhere. Roth, Jr. was acting nervous, taking off his clothes and throwing things in a bag. He noticed that Roth, Jr. had a head injury and that James Anderson had an injury to his hand. Theresa Anderson told Ciccaglione that there had been a robbery, James Anderson had been shot and Roth, Jr. may have killed a man.

On the day after the robbery of the J & R Grocery Store, Holly Schmitt received a telephone call from her long time friends, the Andersons. At Theresa Anderson's request, Schmitt proceeded immediately to the Andersons' residence. They told her there had been a robbery and that someone had been shot. Schmitt could not recall the names of James Anderson's accomplices, only that they were a father and son. The older man had driven the car

and the younger man had gone inside. When Schmitt saw the mess at the Andersons' residence, she cleaned up some of the bloody materials and threw them in a bag. She also picked up and discarded some of the other items. Schmitt then took James and Theresa Anderson to Massachusetts.

On January 1, 1999, the police received an anonymous tip that James Anderson had been involved in the J & R Grocery Store robbery, during which he had been injured, and that he had fled to Massachusetts. The police obtained and executed a search warrant on the Andersons' residence. They found numerous items related to the robberies, including two empty Wilmington Trust deposit bags, nineteen coffee cans some of which contained tokens from Bob's Adult Bookstore, a pair of Motorola two-way radios, boxes containing .38 caliber ammunition, an empty box of Remington shotgun shells, ski masks, camouflage pants and a bloody washcloth.

On January 3, 1999, James Anderson was apprehended in East Hampton, Massachusetts while he sat drinking in a bar with his wife, Theresa. He had a .38 caliber revolver in his possession. Delaware State Police dispatched two detectives, Detectives Dan Bramble and Vincent Fiscella, to East Hampton to interview James Anderson. He gave them a statement confessing to the three robberies in question. He implicated Roth, Sr. and Roth, Jr. as his accomplices. He stated that Roth, Jr. was the person who shot Antunez. Theresa Anderson was also questioned and made a statement, which

---

3. Patricia Roth, however, later changed her account of the events. In fact, at trial, Patricia Roth testified that her son, Roth, Jr. was not present at the Andersons' residence on New Year's Eve 1998.

4. Laskowski also heard the knock on the door and accompanied Brittany and Ciccaglione back to his cousin's house. Laskowski, however, did not return to the Andersons' residence.

corroborated her husband's statement in many respects.

After James Anderson implicated Roth, Sr. and Roth, Jr. in the robberies, the police executed search warrants on several motel rooms and a storage locker located in Stanton, Delaware. In the storage locker, which was leased in the name of Roth, Jr. and his girlfriend, the police discovered a shotgun similar to the one observed at the J & R Grocery Store, a box of .38 caliber ammunition and a gun cleaning kit. An Isuzu Rodeo automobile owned by Roth, Sr. was also searched. DNA analysis revealed that the blood of both James Anderson and the victim, Antunez, was inside the vehicle. DNA analysis also identified blood samples recovered from the grocery store with both the victim, Antunez, and James Anderson.

At the J & R Grocery Store, police recovered five .38 caliber shell casings, all of which came from the same semiautomatic handgun. The police did not recover the semiautomatic handgun but confirmed that the shell casings did not come from James Anderson's .38 caliber handgun. The police also recovered five bullets or bullet fragments during the course of the investigation. Two of the fragments were recovered from the crime scene and three others were removed from the victim, Antunez.

Pursuant to a plea bargain with the State, James Anderson testified at Roth, Jr.'s trial. According to James Anderson, he and three accomplices planned to rob the J & R Grocery Store. Moises Ordorica, the fourth codefendant, taught them certain Spanish phrases for use in the robbery, provided information about the store and received a share of the robbery proceeds. James Anderson's testimony provided a detailed account of the armed robbery and murder at the J & R Grocery Store.

According to James Anderson, Roth, Sr. and Roth, Jr. left his residence together. Roth, Sr. remained in the getaway car and drove back to the residence afterward. James Anderson, armed with a .38 caliber handgun, and Roth, Jr., armed with a shotgun and a semiautomatic handgun, put on masks and entered the grocery store. James Anderson focused on Antunez while Roth, Jr. focused on Rodriguez and went to the back of the store searching for a safe. When he and Antunez struggled, James Anderson's gun discharged twice, hitting Anderson. James Anderson saw Antunez collapse after Roth, Jr. shot him several times. James Anderson also implicated Roth, Sr. and Roth, Jr. in the other robberies.

The jury convicted Roth, Jr. of the charges associated with the armed robbery, the murder at the J & R Grocery Store and the robbery of Bob's Adult Bookstore. The jury, however, did not convict Roth, Jr. of the charges relating to the robbery of the Newport Family Restaurant.

### Theresa's Section 3507 Statement Voluntary

■ At trial, Theresa Anderson was called as a State's witness. Her testimony at trial did not conform to the tape-recorded statement she made to Detective Fiscella in Massachusetts on the day of her husband's arrest. The State then sought to introduce her tape-recorded statement into evidence.[5] Roth, Jr.'s defense counsel objected to any use of the statement at trial on the basis that it had not been given voluntarily.

The trial judge then permitted *voir dire* examination of Theresa Anderson and De-

5. See 11 *Del.C.* § 3507.

tective Fiscella on the issue of voluntariness. Theresa Anderson was questioned first about her statement to Detective Fiscella. When asked why she made the statement, she gave three reasons: her husband wanted her to make the statement, she wanted to cooperate so the police would let her see her husband and Detective Fiscella threatened to take her daughter away from her if she refused to make a statement.

Although Theresa Anderson stated that Detective Fiscella threatened to take her child from her if she refused to make a statement, she did not elaborate on this threat and was unable to remember the words Detective Fiscella used. She did testify, however, that she would not have made the statement had that threat not been made. On cross-examination, the State demonstrated that although Theresa Anderson expressed concern for the welfare of her daughter, who she had left in Delaware, she could not remember with whom her daughter was staying.

During his *voir dire* examination, Detective Fiscella denied making any threat. He testified that he was unaware that Theresa Anderson had a daughter until she mentioned a concern about her daughter's welfare during the interview. On cross-examination, Roth, Jr.'s defense counsel pointed out that James Anderson had previously told Detective Fiscella he had a daughter.

The trial judge resolved the credibility conflict by accepting the testimony of Detective Fiscella. The trial judge noted that Theresa Anderson's testimony contained certain inconsistencies. First, she testified she gave the statement so she would be allowed to see her husband, but also testified that her husband wanted her to make the statement, indicating she had been in contact with him. Second, she expressed concern for her daughter's wel-

fare but was unable to recall with whom she had entrusted her care when fleeing to Massachusetts with her husband. Although Detective Fiscella's testimony was not without its own inconsistencies, the trial judge concluded that Detective Fiscella's only concern with interviewing the Andersons was about investigating the crimes and not the Andersons' family relationships.

Section 3507 provides, in pertinent part, that "[i]n a criminal prosecution, the voluntary out-of-court prior statement of a witness who is present and subject to cross-examination may be used as affirmative evidence with substantive independent testimonial value." The trial judge concluded that Theresa Anderson's testimony regarding Detective Fiscella's threat was not credible. Therefore, the trial judge found her tape-recorded statement to Detective Fiscella to be voluntary and admissible into evidence.

Roth, Jr.'s first argument on appeal is that this ruling was not supported by competent evidence because James Anderson had told Detective Fiscella that he had a daughter before Detective Fiscella interviewed Theresa Anderson. Thus, according to Roth, Jr., Detective Fiscella lied when he testified that he did not know that Theresa Anderson had a daughter until she told him so during the interview. Consequently, Roth, Jr. contends that the trial judge erred by accepting the truth of Detective Fiscella's testimony that he never threatened to take Theresa Anderson's daughter away from her if she did not make a statement.

■ The State bears the burden of proving voluntariness by a preponderance of the evidence. In *Martin v. State*, this Court stated the following:

The State's burden is to prove by a preponderance of the evidence that un-

der the "totality of circumstances" the witness' statements were the product of a rational mind and free will. The trial judge must focus his [or her] attention on ... the behavior of the interrogators, as well as the mental/physical makeup of the individual being interrogated, to determine whether the individual's will was so overborne that the statements produced were not the product of a rational intellect and free will.[6]

■ The record reflects the trial judge acknowledged that arguably Detective Fiscella should have inferred from James Anderson's statement that his daughter was also Theresa Anderson's daughter. The trial judge concluded, however, that Detective Fiscella's attention during the interview with James Anderson was focused on investigating the crimes and not on his family relationships. Accordingly, when Detective Fiscella testified that he did not realize Theresa Anderson had a daughter until she told him this during the interview, the trial judge was not required to conclude that Detective Fiscella was lying. Rather, the trial judge could properly determine, as he did, since that information was not significant to Detective Fiscella, it had not registered with Detective Fiscella when it was related to him by James Anderson.

■ The issue presented to the trial judge was not whether Detective Fiscella knew or should have known about Theresa Anderson's daughter before he interviewed her but whether he threatened to take her daughter away from her should she refuse to make a statement and, thereby, caused her statement to be involuntary. The trial judge was the sole judge of the credibility of both witnesses' testimony during *voir dire* and was responsible for resolving conflicts in their testimony.[7] The record reflects that the trial judge performed this function in a careful and principled manner. In addition to hearing the live testimony of Theresa Anderson and Detective Fiscella, the trial judge listened to Theresa Anderson's tape-recorded statement. The trial judge concluded that Detective Fiscella's testimony was more credible than the testimony of Theresa Anderson.

■ This Court will not disturb findings of fact made by a trial judge when those factual determinations are supported by competent evidence.[8] In this case, the record reflects that the trial judge's credibility determinations are supported by competent evidence. Consequently, the trial judge's ruling that Theresa Anderson's Section 3507 statement was voluntary is affirmed.

■ Nevertheless, Roth, Jr. argues that, even if Theresa Anderson's statement was voluntary, the admission of her Section 3507 statement into evidence violated his right of confrontation under the Sixth Amendment because that statement did not bear "particularized guarantees of trustworthiness" and did not fall within a firmly rooted hearsay exception. This claim is without merit because the declarant, Theresa Anderson, was a witness at trial and available for cross-examination. Out-of-court statements are required to be inherently trustworthy only when the declarant is not available to testify and are admitted solely pursuant to a hearsay exception.[9] The decision of the trial judge to

---

**6.** *Martin v. State,* Del.Supr., 433 A.2d 1025, 1032 (1981); *see State v. Rooks,* Del.Supr., 401 A.2d 943, 948–49 (1979).

**7.** *Coleman v. State,* Del.Supr., 562 A.2d 1171, 1177 (1989) (citing *Tyre v. State,* Del.Supr., 412 A.2d 326, 330 (1980)).

**8.** *Martin v. State,* 433 A.2d at 1033.

**9.** *White v. Illinois,* 502 U.S. 346, 356–57, 112 S.Ct. 736, 116 L.Ed.2d 848 (1992); *Idaho v. Wright,* 497 U.S. 805, 819, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990).

admit Theresa Anderson's Section 3507 statement into evidence is affirmed.[10]

### *Roth, Jr.'s Statement Admissible*

Roth, Jr. filed a pretrial motion to suppress a statement that he made while in the custody of Detective Corrigan. A suppression hearing was held at which Detective Corrigan, Detective Morris and Roth, Jr. testified. Detective Corrigan testified that on the morning of January 4, 1999, he was asked by Sergeant Lawrence to transport Roth, Jr. from Troop 2 to the Gander Hill Prison. Detective Corrigan testified that he was informed that Roth, Jr. had been advised of his *Miranda*[11] rights and had invoked those rights during questioning by Detective Morris.

Detective Corrigan then drove Roth, Jr. to the prison. The prison officials would not accept Roth, Jr., however, unless he first received medical attention because he had a wound on his head. Detective Corrigan drove Roth, Jr. back to Troop 2 and then to the Christiana Hospital.

According to Detective Corrigan, he and Roth, Jr. engaged in "small talk" during the ride, but Detective Corrigan did not ask Roth, Jr. any questions. Detective Corrigan testified that on the way to the hospital, Roth, Jr. asked what charges had been lodged against him. Detective Corrigan told Roth, Jr. that he was charged with robbery and attempted murder. Roth, Jr. asked from what source the police received their information. In reply, Detective Corrigan pulled his patrol car over to the side of the road and either showed or read Roth, Jr. that portion of the warrant affidavit indicating that James Anderson had implicated him in the crimes. Detective Corrigan testified that Roth, Jr. made no reply at that time. At the hospital, however, Roth, Jr. asked to see the warrant affidavit again. According to Detective Corrigan, Roth, Jr. then stated, "That's the problem anymore, there's no loyalty."

Roth, Jr. testified at the suppression hearing on his own behalf. According to Roth, Jr., Detective Corrigan taunted him with the fact that James Anderson informed on him and then told him that both Anderson and his father were going to turn on him, saying, "They have no loyalty for you, they have loyalty for each other." Roth, Jr. testified that he replied, "What's loyalty have to do with me and them?" He denied making the "loyalty" statement that Detective Corrigan attributed to him. Roth, Jr. also testified that he had told Detective Corrigan he did not want to talk to him and had invoked his right to counsel before Detective Morris.

To rebut Roth, Jr.'s assertion that he had invoked his right to counsel, Detective Morris was called to testify at the suppression hearing as a prosecution witness. Detective Morris testified that he questioned Roth, Jr. at Troop 2 on the morning of January 4, 1999 and informed Roth, Jr. of his *Miranda* rights. Roth, Jr. then made a statement denying any involvement in the crimes. According to Detective Morris, Roth, Jr. never invoked his right to counsel or to remain silent.

The trial judge found the testimony of Detective Corrigan to be more credible than that of Roth, Jr. Therefore, the trial judge denied Roth, Jr.'s motion to suppress the "loyalty" statement at the hospital that was attributed to him by Detective Corrigan. Roth, Jr.'s secondary argument in the Superior Court and on appeal is that, even if he made the statement, the trial judge erred by not suppressing the

**10.** *See State v. Rooks,* Del.Supr., 411 A.2d 316, 316–17 (1980).

**11.** *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

statement because it was made in response to interrogation by Detective Corrigan after Roth, Jr. had previously invoked his right to remain silent with Detective Morris.

The trial judge assumed, without deciding that Roth, Jr. had invoked his *Miranda* rights, in light of the conflict in the testimony of Detective Corrigan and Detective Morris on that point. The trial judge then ruled that nothing Detective Corrigan said to Roth, Jr. amounted to interrogation within the meaning of *Miranda v. Arizona*[12] and its progeny. The trial judge specifically rejected the defense contention that this case was factually similar to *Brewer v. Williams*,[13] the Christian burial case.

■ ■ Once Roth, Jr. had invoked his right to remain silent under *Miranda*, the police could not question him unless he initiated the contact with the police and *Miranda* warnings were re-administered.[14] Assuming that Roth, Jr. invoked his rights at Troop 2, the issue on appeal is whether the trial judge correctly ruled that Detective Corrigan's conduct did not constitute interrogation or its functional equivalent. Since the trial judge found Roth, Jr.'s version of what happened not to be credible, the legal issue must be examined in accordance with Detective Corrigan's version of the facts.[15]

■ ■ According to Detective Corrigan, he engaged Roth, Jr. in small talk on the way to the hospital. It was Roth, Jr., however, who first broached the subject of the crimes by asking about the charges and the source of the police information. When Roth, Jr. first learned that James Anderson was the source of the information, Roth, Jr. said nothing. It was only later, at the hospital, when he asked to see the warrant affidavit again that Roth, Jr. made the "loyalty" statement attributed to him by Detective Corrigan.

The State submits that if Roth, Jr. said nothing when he first learned of his informer's identity, Detective Corrigan had no reason to believe that showing Roth, Jr. the affidavit a second time, upon Roth, Jr.'s request, would provoke any type of response. The State argues that the facts of this case are similar to the facts described by this Court in *Johnson v. State*.[16] In *Johnson*, the defendant, upon arrest, indicated to the police that he did not want to make a statement and was never administered *Miranda* warnings. A police officer then took him to a Justice of the Peace Court for presentment. While waiting, the defendant asked the officer how the police knew to follow his vehicle. When the officer responded with an explanation, the defendant made an incriminating comment.[17] In *Johnson*, this Court upheld the trial judge's "factual determination" that the officer's answer to the defendant's question was not designed to provoke a response and, therefore, did not constitute interrogation or its functional equivalent.[18]

In this case, the trial judge ruled that Roth, Jr.'s statement to Detective Corrigan at the hospital was not the product of

---

12.  *Id.*

13.  *Brewer v. Williams*, 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977).

14.  *See Edwards v. Arizona*, 451 U.S. 477, 484–85, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981).

15.  *Coleman v. State*, Del.Supr., 562 A.2d 1171, 1177 (1989).

16.  *Johnson v. State*, Del.Supr., No. 12, 1999, 741 A.2d 1026, 1999 WL 1098173, Holland, J. (1999) (ORDER).

17.  *Id.* at (5).

18.  *Id.* at (9).

interrogation or its functional equivalent. The trial judge properly applied this Court's holding in *Johnson* to the facts of Roth, Jr.'s case. The trial judge correctly determined that Detective Corrigan's actions were not an interrogation within contemplation of *Miranda* and its progeny. The trial judge's decision to admit Roth, Jr.'s statement to Detective Corrigan into evidence is affirmed.

### *Tattoo Evidence Admissible*

■ The State introduced into evidence a tape recording of Roth, Jr.'s initial statement to Detective Morris, in which he said that he did not like guns. The State then called Roth, Jr.'s former girlfriend to testify that Roth, Jr. had a large tattoo of a pistol across his back, along with the words "No Limit." The defense's objection to this evidence, as being irrelevant and unfairly prejudicial, was overruled.

In this appeal, Roth, Jr. again argues the fact that he had a pistol tattooed on his back along with the words "No Limit" was of no relevance to the question of his guilt or innocence. The record reflects that the testimony describing the tattoo was advanced by the State in the context of countering Roth, Jr.'s statement to police that he had an aversion to guns. The State submitted that Roth, Jr.'s tattoo depicting a gun with the phrase "No Limit" stood in obvious contrast to his self-expressed disdain for guns in his statement to police.[19] Thus, the State elicited testimony describing the tattoo to establish that Roth, Jr. had lied to police about an aversion to guns.

The State's ˙effort to rebut Roth, Jr.'s statement that he was adverse to possessing a gun, in the context of an armed robbery and murder, was entirely proper. The trial judge did not abuse his discretion in admitting testimony describing Roth, Jr.'s tattoo for that purpose. The trial judge's ruling on that issue is affirmed as a proper exercise of discretion.

### *Conclusion*

The judgments of the Superior Court are affirmed.

---

19. *See People v. Dunlap*, Colo.Supr., 975 P.2d 723, 744 (1999).