IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| JEFFRIN CABRERA, | § | |
| | § | No. 57, 2025 |
| Defendant Below, | § | |
| Appellant, | § | Court Below: Superior Court |
| | § | of the State of Delaware |
| v. | § | |
| | § | Cr. ID No: 2308012412 (K) |
| STATE OF DELAWARE, | § | |
| | § | |
| Appellee. | § | |
| | § | |

Submitted: December 10, 2025
Decided: March 10, 2026

Before **SEITZ**, Chief Justice; **VALIHURA** and **TRAYNOR**, Justices.

Upon appeal from the Superior Court of the State of Delaware. **AFFIRMED.**

Anthony J. Capone, Esquire, OFFICE OF THE PUBLIC DEFENDER, Wilmington, Delaware, *for Appellant Jeffrin Cabrera*.

John Williams, Esquire, DELAWARE DEPARTMENT OF JUSTICE, Dover, Delaware, *for Appellee State of Delaware*.

**TRAYNOR**, Justice:

On September 10, 2024, a jury found Defendant Jeffrin Cabrera guilty of three counts of rape in the first degree, two counts of burglary in the first degree, one count of attempted rape in the first degree, and one count of terroristic threatening. Two of the first-degree rape counts were predicated on the allegation that Cabrera committed the offenses during the course of, or in the attempted commission of, kidnapping in the first degree. The Superior Court sentenced Cabrera to 72 years imprisonment, subject to a Homeland Security detainer before release. Cabrera now appeals his conviction on two grounds: first, that the Superior Court erred by instructing the jury that kidnapping in the first degree only requires a showing that the defendant acted knowingly and, second, that the court erred by failing to conduct *voir dire* during jury selection that would identify potential jurors who might be biased against those with limited English proficiency. Cabrera raised neither of these issues in the Superior Court. We therefore review his claims for plain error, which Cabrera cannot show. Hence, we affirm his convictions.

I

A

Jeffrin Cabrera first met Flor Munoz Coto ("Munoz") as a customer at Munoz's food stand in Mexico. By 2018, both had separately moved to the United

2

States where they happened to rent rooms in the same house in Ingleside, Maryland. The two dated for a period of three or four months in 2018 before breaking up.

In 2020 or 2021, Munoz moved to Delaware and began her own painting business. Shortly afterward, Munoz and Cabrera had a chance encounter at a gas station. Recognizing Munoz, Cabrera repeatedly asked her for work. Munoz, for her part, attempted to ignore him. After the encounter, Cabrera began following Munoz until she eventually began to provide work for which Munoz paid him.

Between August 2022 and August 2023, Cabrera would periodically reappear at Munoz's home asking for even more money. Munoz testified that, during this period, Cabrera frequently threatened to kill her and her children if she did not send him compromising photos of herself in her underwear and continue to give him money. Additionally, Munoz testified that Cabrera coerced her into calling other women and members of his family to speak positively on his behalf. Munoz estimated that, during this period, she gave Cabrera approximately $10,000.

B

On Sunday, August 20, 2023, Cabrera traveled with Munoz to a painting job. It was late when the two returned to Munoz's home. Munoz testified that she believed that Cabrera had left soon afterward. After showering, she returned outside to clean various painting supplies near an outdoor shed.

3

Cabrera suddenly reappeared. When Munoz asked him why he had not left, Cabrera responded that Munoz was going to "have to have sex with him."[1] Cabrera appeared drunk, holding a beer and smelling of alcohol. Munoz refused his advances. Cabrera then offered a deal: if Munoz spoke to another woman on his phone and told the woman that he was a good person, he would leave. Cabrera then grabbed her by the hands and forcibly kept her in her shed for an hour while he made several calls. He then forced her to make the phone calls to the other women.

At trial, Munoz described the events that followed in explicit detail. According to Munoz, Cabrera put one hand around her neck and began to remove her clothes. He then began to hit Munoz's buttocks, lifted her dress, and lowered her underwear. He then shoved her against a car seat stored in the shed, choked her, beat her, and penetrated her vagina from behind with his penis. Munoz testified, "He [told me] that I will be his as many times as he wanted and that if I were to call the police, he will be free anyways."[2]

Cabrera pulled her hair, and she told him to stop. But, she testified, "he put his penis in my anus and he came inside and after that he just started spanking my buttocks and insulting me."[3] Munoz suffered anal injuries, with tears and surrounding redness. Despite bleeding from her anus for two days after the assault,

---

[1] App. to Opening Br. at A207.
[2] *Id.* at A231.
[3] *Id.* at A231; *see also id.* at A233.

she did not seek medical attention because, according to her testimony, she did not want her daughters to know that she had been sexually assaulted.

Following the Sunday evening assault, Munoz was awakened at 4 or 5 a.m. on Monday morning to Cabrera standing over her bed. Despite protests from Munoz, Cabrera again assaulted her. Around 4:45 a.m. on the morning of Wednesday, August 23, 2023, Munoz again discovered Cabrera inside her home. She told Cabrera that he was not going to assault her again, took her phone, and called the Dover Police. Cabrera abandoned his clothes on Munoz's bedroom floor and fled naked through a window.

That morning, Munoz went to Bayhealth Hospital, where she was examined by a forensic nurse clinical coordinator. The nurse noted Munoz's anal injuries, and injuries to her breasts and legs. The nurse also prepared a sexual assault nurse examiner ("SANE") kit for Munoz.

Dover Police arrested Cabrera on August 24, 2023 and executed a search warrant for his DNA. Bethany Netta, a Forensic DNA Analyst, prepared a DNA Report from Munoz's SANE kit and Cabrera's DNA swabs. Sperm was detected on Munoz's vaginal vault swab. The sperm sample matched Cabrera's DNA profile. Ms. Netta later testified, at trial, that the probability of a third party sharing Cabrera's DNA profile was 1 in 21,140,000.

5

C

The case proceeded to a trial by jury. During jury selection, the defense did not request any special *voir dire* of the jury array and the trial court did not *sua sponte* question prospective jurors about possible bias if an interpreter was utilized at trial for any witness testimony. After jury selection, however, the Superior Court instructed the jury about the use of foreign language interpreters, stating:

> Now, lastly, one final instruction: In this case interpreters are being used to translate and assist the Court and the defendant. The fact that an interpreter is necessary or the fact that the defendant or a witness does not speak or have—may have difficulty with the English language is irrelevant to your job as judges of the facts of the case.
> Bias against or for persons who have little or no proficiency in English or because they do not use English is not allowed. You must perform your jobs as jurors impartially and fairly without regard to race, national origin, or one's ability to speak English. The fact that any party or witness requires an interpreter must not influence your view of this case in any way.[4]

Cabrera's trial—from jury selection to verdict—lasted six days. Cabrera elected not to testify.

At a prayer conference following the witness testimony but before closing arguments, a question arose as to the state-of-mind element for kidnapping, which, as mentioned, was a predicate felony under two of the rape counts. The prosecutor pointed out that kidnapping in the first degree, as defined by statute, did not appear to have a specified intent element. The court responded, "I think it would require

---

[4] *Id.* at A156–57.

6

knowingly by default if there's no *mens rea* in there."[5]  The prosecutor agreed.

Cabrera's trial counsel also affirmed, stating:  "It should be knowingly, Your

Honor."[6]  As will be developed more fully below, the jury was instructed

accordingly.  This decision forms the basis of Cabrera's lead argument on appeal.

In its final jury instructions, the Superior Court revisited the use of courtroom

foreign-language interpreters, stating:

> Courtroom Interpretation.  The Court seeks a fair trial for all regardless
> of the language a person speaks and regardless of how well a person
> may or may not use the English language.  Bias against or for persons
> who have limited proficiency in English is not allowed.  The fact that
> any party or witness requires an interpreter must not influence you in
> any way.
> The role of an interpreter is to interpret the questions and interpret the
> responses of a witness.  They will not add or subtract from the
> questions, nor add or subtract from the responses.  The evidence
> translated is to be considered by you only from the official court
> interpreter.  Although some of you may know Spanish, it is important
> that all jurors consider the same evidence.  Therefore, you must base
> your decision on the evidence presented in the English interpretation.
> You must not—you must disregard any different meaning of the non-
> English words.[7]

After deliberating for just under two-and-a-half hours, the jury returned guilty

verdicts on all seven indicted charges.  After the court imposed a 72-year prison

sentence, Cabrera appealed.

---

[5] *Id.* at A602–03 (italics added).
[6] *Id.*
[7] *Id.* at A658.

II

A

As mentioned at the outset, Cabrera raises two issues on appeal, challenging the adequacy of the kidnapping jury instruction and pre-jury selection *voir dire* of the jury array. The parties agree that neither issue was raised below. We will not consider questions on appeal that were not fairly presented to the trial court. But a narrow exception allows us to consider a "question for the first time on appeal 'when the interests of justice so require.'"[8] This exception is "extremely limited," however, and invokes the plain error standard of review.[9]

"[T]he doctrine of plain error is limited to material defects which are apparent on the face of the record; which are basic, serious and fundamental in their character, and which clearly deprive an accused of a substantial right, or which clearly show manifest injustice."[10] The error "must be so clearly prejudicial as to substantial rights as to jeopardize the fairness and integrity of the trial process."[11] The error must have affected the outcome of the trial.[12] This means that, but for the error,

---

[8] *Ravindran v. GLAS Tr. Co. LLC*, 327 A.3d 1061, 1078 (Del. 2024) (quoting Supr. Ct. R. 8).
[9] *Id.* (citing *Wainwright v. State*, 504 A.2d 1096, 1100 (Del. 1986)).
[10] *Jewell v. State*, 340 A.3d 562, 585 (Del. 2025) (quoting *Turner v. State*, 5A.3d 612, 615 (Del. 2010)).
[11] *Id.*
[12] *Id.*; *Morales v. State*, 133 A.3d 527, 529 (Del. 2016).

there is a reasonable probability that the outcome of the proceedings would have been different.[13]

B

Cabrera's first argument is centered on the trial court's jury instruction concerning the elements of kidnapping in the first degree. Cabrera was not charged separately with kidnapping. He was, however, charged with rape in the first degree, an element of which (as charged here) is that non-consensual sexual intercourse "was facilitated or occurred during the course of the commission or the attempted commission of . . . [a]ny felony[.]"[14] Under Counts 3 and 4 of the indictment, the felony was kidnapping in the first degree. Consequently, although Cabrera was not charged separately with kidnapping, the trial court instructed the jury on the elements of that offense.

As mentioned earlier, the court, the prosecutor, and Cabrera's counsel had discussed the kidnapping instruction at a prayer conference. Believing that the kidnapping statute did not prescribe a state of mind sufficient to establish the crime of kidnapping in the first degree, the court suggested—and counsel agreed—that the state-of-mind element is established if the State proves the accused acted knowingly. In reaching this conclusion, it appears as though the court and counsel were relying

---

[13] *Suber v. State*, ___ A.3d ___, 2026 WL 184867, at *6 (Del. 2026).
[14] 11 *Del. C.* § 773(a)(2)(a).

on 11 *Del. C.* § 251(b), which provides that "[w]hen the state of mind sufficient to establish an element of an offense is not prescribed by law, that element is established if a person acts intentionally, knowingly or recklessly."

Accordingly, the jury was instructed that the second element of kidnapping in the first degree requires that "the Defendant acted knowingly . . . ."[15] "Knowingly" was then defined, as follows:

> *Knowingly* means the Defendant was aware the Defendant was restraining a person and that he was acting unlawfully. Restrain means the Defendant *intentionally* restricted the person's movements or substantially interfered with the person's liberty by moving the person from one place to another or by confining the person in a place without the person's consent. The person was moved or confined without consent if the movement or conferment was accomplished by physical force, intimidation or deception.
> Restraint is independent of and not incidental to another crime when it involves significantly more interference with the person's liberty than what is normally incidental to the other crime.[16]

Notably, when the court was explaining the crime of kidnapping to the jury, it did not explain the meaning of the word "intentionally" as defined in our Criminal Code. It had, however, provided the definition of "intentionally" when explaining other elements of the rape counts. Specifically, the court instructed the jury that "[i]ntentionally means it was the Defendant's conscious objective or purpose to

---

[15] App. to Opening Br. at A653.
[16] *Id.* at A653–54 (emphasis added).

engage in sexual intercourse with the person."[17]  The court's failure to instruct the jury similarly as to the restraint element of kidnapping, according to Cabrera, rendered the instruction as given deficient.

Cabrera has a point here.  His position finds support in the kidnapping statute and in our case law.  Kidnapping in the first degree is defined in 11 *Del. C.* § 783A. As is relevant here, a person is guilty of the offense "when the person *unlawfully restrains* another person . . . [t]o facilitate the commission of any felony or flight thereafter[.]"[18]  Although § 783A does not expressly identify a *mens rea* element, unlawful restraint is an element of first-degree kidnapping.  And the word "restrain" is defined in § 786—a section titled "Kidnapping and related offenses; definitions"—as "restrict[ing] another person's movements *intentionally* in such a manner as to interfere substantially with the person's liberty. . . ."[19]  Not surprisingly, therefore, in *Scott v. State*,[20] this Court held that "[a] proper jury instruction on the statutory offense of kidnapping . . . necessarily requires a finding of intentional

---

[17] *Id.* at A641.  According to 11 *Del. C.* §231(b), "[a] person acts intentionally with respect to an element of an offense when . . . [i]f the element involves the nature of the person's conduct or a result thereof, it is the person's conscious object to engage in conduct of that nature or to cause that result[.]"

[18] 11 *Del. C.* § 783A(3) (emphasis added).

[19] 11 *Del. C.* § 786(c) (emphasis added).

[20] 521 A.2d 235 (Del. 1987).

action as defined under 11 *Del. C.* § 786."[21]  Here, the Superior Court's instruction fell short of this mark.[22]

It is questionable though whether the instruction's deficiency rises to the level of reversible error, much less plain error.  "The primary purpose of jury instructions is to define with substantial particularity the factual issues and clearly to instruct the jury as to the principles of law that they are to apply in deciding the factual issues presented in the case before them."[23]  It is the trial court's independent responsibility to properly instruct the jury.[24]  Although "a defendant is not entitled to a particular instruction, [] he does have the unqualified right to a correct statement of the substance of the law."[25]  "And, 'while some inaccuracies and inaptness in statement are to be expected in any charge, this Court will reverse if the alleged deficiency in the jury instructions undermined . . . the jury's ability to intelligently perform its

---

[21] *Id.* at 243–44; *see also Key v. State*, 463 A.2d 633, 641 (Del. 1983) ("The kidnapping statute does not expressly prescribe the nature of a defendant's state of mind, and at first glance it may appear that kidnapping is proven by evidence of a less culpable state of mind than is required in cases of unlawful imprisonment.  However, restraint of another for purposes of kidnapping is achieved through intentional action and . . . that state of mind is incorporated into the substantive statute.").  Cabrera, having mentioned neither *Scott* nor *Key* in his opening brief, cited both in his reply brief, contending that "[a]n incomplete instruction on state of mind for kidnapping is plain error under *Scott*."  Reply Br. at 7.  We do not read *Scott* that way.  Scott challenged the kidnapping instruction on three grounds, only one of which related to state of mind.  Although the Court found that state-of-mind aspect of the instruction wanting, its reversal of Scott's conviction was based on the other two grounds.

[22] The State has not seriously contested this proposition, arguing instead that the instruction was not so deficient as to constitute plain error.

[23] *Bullock v. State*, 775 A.2d 1043, 1047 (Del. 2001) (quoting *Zimmerman v. State*, 565 A.2d 887, 890 (Del. 1989)).

[24] *Id.*; *Zimmerman*, 565 A.2d at 891.

[25] *Bullock*, 775 A.2d 1047; *see also Hamilton v. State*, 82 A.3d 723, 726 (Del. 2013).

duty in returning a verdict.'"[26] But "[a] trial court's charge to the jury will not serve as grounds for reversible error if it is 'reasonably informative and not misleading, judged by common practices and standards of verbal communication.'"[27]

Here, the instruction did not misstate the law so much as it omitted the inarguably instructive statutory definition of "intentionally." But the instruction correctly stated that Cabrera must have intentionally restrained Munoz, and the concept of intentionality was explained earlier in the instructions. One might reasonably conclude, therefore, that the instruction, though imperfect, was, under the facts of this case, sufficiently informative and not misleading. Our task, however, is to determine whether the instruction's imperfection rises to the level of plain error. We conclude that it does not.

We find plain error when clear prejudice to substantial rights jeopardizes the fairness and integrity of the trial process.[28] The record does not show such prejudice. Defense counsel was present when the court considered the proper *mens rea* for first-degree kidnapping and agreed that the *mens rea* "should be knowingly."[29] Moreover, strong evidence supported the conviction, including Munoz's testimony; Cabrera's DNA, which matched sperm found in Munoz's vagina; recordings of his

---

[26] *Bullock*, 775 A.2d at 1047 (quoting *Flamer v. State*, 490 A.2d 104, 128 (Del. 1983)); *see also Probst v. State*, 547 A.2d 114, 119 (Del. 1988); *Hale v. State*, 337 A.3d 1214, 2024 WL 5116860, at *2 (Del. Dec. 16, 2024) (TABLE).

[27] *Probst*, 547 A.2d at 119 (quoting *Baker v. Reid*, 57 A.2d 103, 109 (Del. 1947)).

[28] *Jewell*, 340 A.3d at 585.

[29] App. to Opening Br. at A602–03.

vehicle near her residence on August 23; and his clothing, passport, and immigration card—all recovered from Munoz's bedroom. Against this evidentiary backdrop and taking into account the challenged instruction's literal accuracy, we are hard pressed to conclude that the trial process resulting in Cabrera's convictions was unfair or lacked integrity. Nor do we believe that, had the missing *mens rea* definition been included in the jury instructions, the outcome of Cabrera's trial would have been different. In a nutshell, there was no plain error.

C

Cabrera contends that the trial court committed plain error by failing to question prospective jurors during *voir dire* to ascertain whether they would be biased against persons with limited English proficiency. In his view, later instructions on the involvement of foreign-language interpreters were an inadequate substitute for weeding out juror bias before the jury was selected.[30] He argues that, under this Court's decision in *Diaz v. State*,[31] the trial court was required to ask prospective jurors whether they would be influenced or biased by the participation of foreign-language interpreters during the trial.

---

[30] Opening Br. at 23–27.

[31] 743 A.2d 1166 (Del. 1999). Cabrera also cites the Superior Court's decision in *State v. Ramirez*, 2025 WL 511940 (Del. Super. Feb. 17, 2025) as a case in which "the Superior Court granted a new trial . . . for a defendant who had used an interpreter." Opening Br. at 24. As we read *Ramirez*, the involvement of a foreign-language interpreter played no role in the court's decision to grant a new trial. Instead, the court grounded its decision in the prejudice likely suffered by the defendant when prosecution witnesses improperly referred to his immigration status, veracity, and drug use. We do not see how *Ramirez*'s legal analysis bears on the questions before us.

14

To be sure, in *Diaz*, the Court cautioned that "English-only speaking jurors should be asked during *voir dire* if the fact that some testimony would be given in a language other than English would influence them in any way."[32] But *Diaz* did not address the circumstances that are present in this case. Instead, it concerned the challenges posed when a juror is bilingual and testimony is presented through an interpreter who translates from a non-English language known to the juror. There was no claim of juror bias against the defendant because testimony was introduced through the interpreter. Seen in this light, the statement in *Diaz* about what trial judges *should* do in cases in which English-only speaking jurors will hear testimony given through an interpreter was obiter dictum, consistent with best practices but not a rule whose violation warrants reversal.

Even if we were to accept the statement in *Diaz* as establishing a rule that is binding on our trial courts, the purported violation of the rule did not, in our estimation, jeopardize the fairness and integrity of Cabrera's trial. For starters, the trial court twice instructed the jury—first after jury selection and again before deliberations—regarding the irrelevance of the defendant's or witnesses' English-language proficiency and the impropriety of related bias. Second, Cabrera did not testify. Munoz—the State's principal witness and Cabrera's victim—was the only witness who testified with the benefit of an interpreter. Cabrera does not explain

---

[32] *Id*. at 1173.

how he was more likely to be the subject of juror bias than was Munoz. And finally, the evidence supporting the jury's verdict—Munoz's and the forensic nurse testimony, her documented injuries, the DNA match—was compelling. In short, any deficiency in the trial court's *voir dire* examination of the jury array is very unlikely to have affected the outcome of the trial. The trial court's failure to ask questions during *voir dire* that Cabrera did not request was not plain error.

## III

We affirm the Superior Court's judgment and Cabrera's convictions.